# In the United States Court of Federal Claims

No. 05-1186C
(Filed Under Seal: May 31, 2006)
(Re-Issued: May 31, 2006)
**TO BE PUBLISHED**[*]

*******************************************
|  |  |  |
|---|---|---|
| | * | Administrative Procedure Act; |
| COMPREHENSIVE HEALTH | * | 5 U.S.C. §§ 701, *et seq.*; |
| SERVICES, INC., | * | Duty of Good Faith, Fair Dealing, |
| | * | and Honest Consideration; |
| Plaintiff, | * | Motion for Judgment on the Administrative |
| | * | Record, RCFC 56.1; |
| v. | * | Motion to Supplement the |
| | * | Administrative Record; |
| THE UNITED STATES, | * | Post-Award Bid Protest, |
| | * | 28 U.S.C. §§ 1491(a)(1), (b)(1); |
| Defendant, | * | RESTATEMENT (SECOND) OF |
| | * | CONTRACTS § 205; |
| and | * | 10 U.S.C. §§ 2305(b)(1), (4)(c); |
| | * | 48 C.F.R. §§ 15.303(b)(6), 15.305(a)(2), |
| WYLE LABORATORIES, INC., | * | 15.308. |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |

*******************************************

**Cyrus Eastman Phillips, IV**, Washington, D.C., for Plaintiff.

**Lauren Springer Moore**, United States Department of Justice, Washington, D.C., for Defendant.

**Leigh Turner Hansson**, Reed Smith LLP, Washington, D.C., for Defendant-Intervenor.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge*

This post award bid protest case was filed by Comprehensive Health Services, Inc. ("CHS"), a provider of occupational medicine support services, to challenge the October 28, 2005 award of

---

[*] On May 22, 2006, a pre-publication draft of this Memorandum Opinion and Final Order was provided under seal to the parties. The parties were instructed to propose any redactions. On May 31, 2006, this Memorandum Opinion and Final Order was published with redactions, indicated by the designation "[deleted]," and several clarifying editorial changes made by the court. The non-redacted version also was filed on May 31, 2006 under seal with the Clerk of the United States Court of Federal Claims.

the Occupational Medicine and Occupational Health Contract by the National Aeronautics and Space Administration ("NASA") to Wyle Laboratories, Inc. ("Wyle"), because NASA allegedly violated: procurement statutes and regulations; acted unreasonably or without rational basis; and breached an implied duty of good faith, fair dealing, and honest consideration. CHS requests that the court issue a permanent injunction ordering NASA to appoint a new Source Selection Authority and award CHS legal and equitable relief.

For the reasons discussed herein, the court has determined that NASA's award of the Contract did not violate any statute, regulation, provision of the United States Constitution or breach the implied duty of good faith, fair dealing, and honest consideration. Accordingly, judgment is issued in favor of the Government.

To facilitate a review of this Memorandum Opinion and Final Order, the court has provided the following outline:

## I. RELEVANT FACTS

A.      Request For Proposal No. NNJ05064093R.

B.      The Source Evaluation Board And The Solicitation's Selection Criteria.

C.      The Chairman Of The Source Evaluation Board's Presentations To The Source Selection Authority.

      1.      The September 12, 2005 Presentation.

            a.      Wyle Laboratories, Inc.

            b.      Comprehensive Health Services, Inc.

      2.      The Source Selection Authority's Dissatisfaction With The Evaluation Of The Safety And Health Approach Subfactor.

      3.      The September 14, 2005 Re-Evaluation.

D.      The Source Selection Statement.

      1.      Analysis Of The Technical Approach Subfactor.

      2.      Analysis Of The Management Approach Subfactor.

a.     "Weaknesses."

     i.     Wyle Laboratories, Inc.'s Proposal.

     ii.     Comprehensive Health Services, Inc.'s Proposal.

b.     "Strengths" And "Significant Strengths."

     i.     Wyle Laboratories, Inc.'s Proposal.

     ii.     Comprehensive Health Services, Inc.'s Proposal.

c.     Overall.

3.     Analysis Of The Small Disadvantaged Business Plan Subfactor.

4.     Analysis Of The Safety And Health Plan Subfactor.

5.     Analysis Of The Past Performance Factor.

6.     Analysis Of The Cost Factor.

E.     The Source Selection Authority Selects Wyle Laboratories, Inc.'s Proposal As The "Best Overall Value To The Government."

II.  PROCEDURAL BACKGROUND

III.  DISCUSSION

A.     Jurisdiction.

B.     Standing.

1.     Plaintiff Comprehensive Health Services, Inc.

a.     Comprehensive Health Services, Inc. Is An "Interested Party."

b.     Comprehensive Health Services, Inc. Had A "Substantial Chance" Of Being Awarded The Contract.

2.     Intervenor Wyle Laboratories, Inc.

C.      Relevant Standard For Decision.

      1.      On Supplementing The Administrative Record.

      2.      On Judgment On The Administrative Record.

D.      The Court's Resolution Of The Parties' Motions.

      1.      The Government's Motion To Supplement The Administrative Record.

      2.      The Parties' Cross-Motions For Judgment On The Administrative Record.

            a.      The Source Selection Authority Did Not Violate 10 U.S.C. § 2305(b)(1) Or Federal Acquisition Regulation 15.305(a)(2).

            b.      The Source Selection Authority Did Not Violate 10 U.S.C. § 2305(b)(4)(c) Or Federal Acquisition Regulations 15.303(b)(6) And 15.308.

            c.      The Source Selection Authority Did Not Violate Federal Acquisition Regulation 15.305(a)(3).

            d.      The Source Evaluation Board's Re-Evaluation Of The Safety And Health Plan Subfactor Had A Rational Basis.

            e.      The Source Selection Authority's Decision Had A Rational Basis.

                  i.      Comprehensive Health Services, Inc.'s Lead Physician's Failure To Have A Texas Medical License By August 24, 2005 Was A "Weakness."

                  ii.     Wyle Laboratories, Inc.'s Failure To Provide A Plan For Adequate Staffing Of The Starport Fitness Center Was Not An "Important Concern."

                  iii.    Comprehensive Health Services, Inc. And Wyle Laboratories, Inc. Had "A Roughly Equivalent Volume Of Relevant Experience."

                  iv.     Wyle Laboratories, Inc. Had More "Large Dollar Value Contracts."

                  v.      Wyle Laboratories, Inc.'s Proposed Program Manager Provided "Greater Value" To The Government.

vi.     Wyle Laboratories, Inc.'s Personnel Was Considered A "Valuable Asset" By The Government.

vii.    Wyle Laboratories, Inc.'s And Comprehensive Health Services, Inc.'s Cost Estimates Were "So Close As To Not Be Worthy Of Further Consideration."

viii.   Comprehensive Health Services, Inc.'s And Wyle Laboratories, Inc.'s Proposals Were Evaluated In The Same Manner.

f.      The Source Selection Authority Did Not Breach An Implied Duty Of Good Faith, Fair Dealing, And Honest Consideration.

IV.  CONCLUSION

# I.  RELEVANT FACTS[1]

## A.      Request For Proposal No. NNJ05064093R.

On March 23, 2005, NASA's Lyndon B. Johnson Space Center ("JSC") issued a Request for Proposal No. NNJ05064093R ("the Solicitation"), a Solicitation for Competitive Proposals, for a single cost plus award term with performance incentive fee contract, known as the Occupational Medicine and Occupational Health ("OMOH") Contract.  *See* AR 1-364.  The OMOH Contract is a three-year contract with seven optional one-year extensions, for a total potential period of performance of ten years.  *See* AR 2.  The OMOH Contract required the delivery of occupational medicine support services to operate the JSC's Occupational, Emergency, and Preventative Medicine programs and associated clinical wellness programs, including:

- a health care program for NASA employees and contractors stationed in Russia;

- delivery of Flight Medicine support services, required for operation of the Flight Medicine Clinic that includes aerospace and family practice medicine for NASA astronauts and their immediate family members;

- delivery of Human Test Support Services, as required for monitoring and supporting test and crew training activities in altered-pressure environments;

- delivery of Occupational Health Support Services, including industrial hygiene, asbestos control and monitoring, radiation safety, environmental surveillance, and operation of a comprehensive health laboratory; and

- delivery of White Sands Test Facility Occupational Medicine and Health in Las Cruces, New Mexico, including Occupational, Emergency, and Preventative Medicine programs.

*See* AR 1-2.

---

[1] The relevant facts herein are derived from:  Plaintiff's November 10, 2005 Complaint; Plaintiff's December 14, 2005 Amended Complaint ("Amend. Compl."); the Administrative Record ("AR" 1-5515), filed on November 17, 2005, and supplemented on November 23, 2005 and by this Memorandum Opinion and Final Order; Plaintiff's November 22, 2005 Motion for Judgment on the Administrative Record ("Pl. Mot. for J."), together with a Brief in support ("Pl. Br."); the Government's November 30, 2005 Cross-Motion for Judgment on the Administrative Record ("Gov't Cross-Mot."); Intervenor's November 30, 2005 Response ("Int. Resp."); the Transcript of the December 1, 2005 Oral Argument; Plaintiff's December 14, 2005 Supplemental Brief ("Pl. Supp. Br."); the Government's December 22, 2005 Supplemental Response Brief ("Gov't Supp. Resp. Br."); the Government's December 22, 2005 Motion to Supplement the Administrative Record ("Gov't Mot. to Supp."); Intervenor's December 22, 2005 Supplemental Response ("Int. Supp. Resp."); Plaintiff's December 29, 2005 Supplemental Reply Brief and Opposition ("Pl. Supp. Reply Br."); and the Government's January 4, 2006 Reply to its December 22, 2005 Motion to Supplement the Administrative Record ("Gov't Reply").

The Solicitation identified three evaluation factors: a) Mission Suitability; b) Past Performance; and c) Cost Evaluation. *See* AR 361-64; *see also* AR 314-32. The Solicitation also identified four subfactors considered under the Mission Suitability Factor, *i.e.*, a) Management Approach; b) Technical Approach; c) Safety and Health Plan; and d) Small Disadvantaged Business Participation Plan. *Id.*

The Solicitation designated a Source Evaluation Board ("SEB") to evaluate proposals, with the assistance of *ex-officio* supporting personnel, pursuant to the Federal Acquisition Regulations ("FAR") and the NASA FAR Supplement.[2] *See* AR 361. According to the Solicitation, the findings of the SEB Chairman were submitted to the Source Selection Authority ("SSA"), who was responsible for selecting the "proposal(s) [that] represents the *best value* after evaluation in accordance with the factors and subfactors in the [S]olicitation." AR 302 (emphasis added); *see also* AR 361 ("The SEB will carry out the evaluation activities and report its findings to the Source Selection Authority (SSA), who is responsible for making the source selection decision."); NASA

---

[2] The NASA Federal Acquisition Regulations Supplement ("NASA FAR Supplement") "contains both acquisition regulations that require public comment and internal Agency guidance and procedures that do not require public comment." 48 C.F.R. § 1801.105-1(b)(i). NASA must comply with all regulatory and internal guidance and procedures contained in the NASA FAR Supplement. *Id.* Only those regulations that require public comment are issued in 48 C.F.R. Ch. 18. *See* 48 C.F.R. § 1801.105-1(b)(ii); *see also id.* § 1801.105-1(b)(iii) ("The single official NASA-maintained version of the [NASA FAR Supplement] is on the Internet (http://www.hq.nasa.gov/office/procurement/regs/nfstoc.htm).").

FAR Supp. 1815.370(h).[3]  In this case, the designated SSA was the Deputy Director of the JSC.  *See* AR 546, 601.

The Solicitation also specified a number of services that the contractor was required to provide.  For example, nurses assigned to the JSC Occupational Medicine or Flight Medicine Clinic were required to be Registered Nurses ("RN's"), currently licensed to practice in the State of Texas.  *See* AR 24.  The Solicitation also required that the contractor "support day-to-day operations of the Starport Fitness Facility" at the JSC Gilruth Center.  *See* AR 39.  In addition, all proposed physicians, *e.g.*, Lead Physician, Staff Physician, Deputy Lead Physician, Family Clinic Physician, were required to have a "current license to practice medicine in the State of Texas."  AR 263-64.  In addition, the Solicitation required offerors to submit a Phase-In Plan for a transition period of up to thirty days, followed by the three-year Basic Period of Performance and seven one-year options.  *See* AR 312, 315.  In addition, the Solicitation required that the Technical Approach section of an offeror's proposal contain a "Basis of Estimate" to provide the supporting rationale for all proposed resources, *e.g.,* full-time employees, skill mix, a discussion of any assumption regarding the

---

[3] The NASA FAR Supplement requires that:

(1) The SEB Chairperson shall brief the SSA on the results of the deliberations to permit an informed and objective selection of the best source(s) for the particular acquisition.

(2) The presentation shall focus on the significant strengths, deficiencies, and significant weaknesses found in the proposals, the probable cost of each proposal, and any significant issues and problems identified by the SEB.  This presentation must explain any applicable special standards of responsibility; evaluation factors and subfactors; the significant strengths and significant weaknesses of the offerors; the Government proposed cost/price; the probable cost; the proposed fee arrangements; and the final adjectival ratings and scores to the subfactor level.

(3) Attendance at the presentation is restricted to people involved in the selection process or who have a valid need to know.  The designated individuals attending the SEB presentation(s) shall:

(i) Ensure that the solicitation and evaluation processes complied with all applicable agency policies and that the presentation accurately conveys the SEB's activities and findings;

(ii) Not change the established evaluation factors, subfactors, weights, or scoring systems; or the substance of the SEB's findings.  They may, however, advise the SEB to rectify procedural omissions, irregularities or inconsistencies, substantiate its findings, or revise the presentation[.]

NASA FAR Supp. 1815.370(h).

proposed resources, and sufficient detail to demonstrate that the proposed resources are realistic.[4] *See* AR 320-21.

**B.     The Source Evaluation Board And The Solicitation's Selection Criteria.**

The SEB was comprised of six voting members, all of whom were JSC employees. *See* AR 546, 601, 4381, 5244. The governing NASA FAR Supplement also required:

> The SEB [to assist] the SSA by providing expert analyses of the offerors' proposals in relation to the evaluation factors and subfactors contained in the solicitation. The SEB will prepare and present its findings to the SSA, avoiding trade-off judgments among either the individual offerors or among the evaluation factors. The SEB will not make recommendations for selection to the SSA.

NASA FAR Supp. 1815.370(b).

On April 25, 2005, three proposals were submitted in response to the Solicitation by: CHS; Wyle; and [deleted]. *See* AR 605, 4390. The SEB conducted a preliminary review and found that all three proposals were acceptable. *See* AR 4390, 4395-96, 4401; *see also* 48 C.F.R. § 1815.305-70 (setting forth the circumstances where a proposal may be deemed unacceptable). The SEB, however, decided that only the proposals submitted by CHS and Wyle were in the competitive range. *See* AR 606, 4396, 4769-71, 4803-05, 4832-33, 5063-64; *see also* 48 C.F.R. § 1815.306.

Accordingly, CHS and Wyle were invited "to participate in written and oral discussions, and both were given the opportunity to correct, clarify, substantiate, or confirm the contents of their proposals and to submit a final proposal revision [("FPR")] and a signed model contract[.]" AR 606. The deadline for final proposal revisions and clarifications was August 24, 2005. *See* AR 4834, 4873.

The SEB again evaluated these proposals based on the three evaluation factors set forth in the March 23, 2005 Solicitation, *i.e.*, Mission Suitability;[5] Past Performance;[6] and Cost.[7] *See* AR

---

[4] The Solicitation included a "Labor Independent Government Estimate," *i.e.*, NASA's estimate of the labor resources (full-time equivalent positions) required to perform the proposed OMOH Contract. *See* AR 323-24. The Labor Independent Government Estimate stated that 86.5 full-time equivalent positions are required during each year of the ten-year contract term. *See* AR 324. This estimate includes all labor required to perform the entire Statement of Work, with the exception of traditional general and administrative type personnel. *Id.*

[5] The Solicitation specified that the Mission Suitability Factor would be numerically scored. *See* AR 361. The maximum number of points for this factor was 1,000. *See* AR 362. This maximum number of points was allocated among the following subfactors: Management Approach (300); Technical Approach (450); Safety and Health Plan (150); and Small Disadvantaged Business

361-64.  The Solicitation emphasized that the Mission Suitability and Past Performance Factors combined were considered "*significantly* more important" than Cost.  AR 364 (emphasis added).  Mission Suitability and Past Performance were to be weighed as being approximately equal.  *Id.*

**C.   The Chairman Of The Source Evaluation Board's Presentations To The Source Selection Authority.**

**1.   The September 12, 2005 Presentation.**

On September 12, 2005, the SEB Chairman reported the results of the SEB's evaluation to the SSA.  *See* AR 605; *see also* AR 5047-240.

---

Participation (100).  *Id.*  Point determinations were to be made when the SEB determined the proposals had:  "Significant Strengths;" "Strengths;" "Significant Weaknesses;" "Weaknesses;" and "Deficiencies."  *See* AR 5247.  The Past Performance Factor, however, was to be rated adjectively, "based on information provided by the offeror in their proposals, as well as any other information obtained independently by the SEB."  AR 363.

[6] The Solicitation required that each offeror first identify up to five contracts within the past three years "that demonstrate the ability of the offeror to perform the OMOHC work."  AR 326.  The Past Performance Factor allowed the SEB to compare relevant earlier work of offerors to determine how they can be expected to perform the proposed work.  *See* AR 363.  Each offeror also was to provide the Contracting Officers with "Past Performance Questionnaires" of former customers.  *See* AR 340.  The "Past Performance Questionnaire" asked former customers to rate each offeror's compliance with "Technical Performance," "Contract Management and Cost Performance," and "General" categories.  *See* AR 343-50.  Three questions in the Technical Performance category asked former customers to rate the offeror's compliance with:  "technical requirements and standards in providing occupational medicine support and services;" "technical requirements and standards in providing flight medicine support and services;" and "technical requirements in providing occupational health support and services."  AR 343.  The "Past Performance Questionnaires" also asked former customers to rate each offeror as "Exceptional," "Satisfactory," "Unsatisfactory," or "Not Applicable" in each of the following five technical areas:  "Occupational Medicine;" "Flight Medicine;" "Human Test Support and Training;" "Environmental Health;" and "Occupational Health."  AR 344.

[7] The Cost Factor was to be based on a cost-realism analysis of the estimate provided in the Cost/Price Proposal volume of the proposal.  *See* AR 363-64.

a.      **Wyle Laboratories, Inc.**

The SEB Chairman rated Wyle's Past Performance with one "Significant Strength," two "Strengths," and four "Weaknesses."  *See* AR 5183-92.[8]  This corresponded to an adjectival rating of "Excellent."  *See* AR 5033, 5122.

With regard to Mission Suitability, Wyle received six "Significant Strengths," four "Strengths," and three "Weaknesses" in the Management Approach Subfactor;[9] three "Significant Strengths," and five "Strengths" in the Technical Approach Subfactor; one "Strength" in the Safety and Health Plan Subfactor;[10] and one "Weakness" in the Small Disadvantaged Business Participation Subfactor.  *See* AR 5132-37; *see also* AR 5138-92.  The numerical and adjectival ratings for the four subfactors for the Mission Suitability evaluation factor were as follows:

| Subfactor | Point Score | Adjectival Rating |
|---|---|---|
| Management Approach | [deleted] | Excellent |
| Technical Approach | [deleted] | Excellent |
| Safety and Health Plan | [deleted] | Good |
| Small Disadvantaged Business Participation | [deleted] | Good |

---

[8] The SEB identified four "Weaknesses" with Wyle's Past Performance.  *See* AR 5040-41, 5137, 5189-92.  First, Wyle and Kelsey-Seybold Clinic ("Kelsey-Seybold"), the incumbent contractor, had a contentious relationship.  *See* AR 5137, 5191.  Second, Wyle failed to remedy a low Performance Evaluation Profile issued in connection with the current contract, indicating a lack of responsiveness.  *See* AR 5137, 5190.  Third, Wyle planned to use a major subcontractor that failed to provide adequate physician staffing in connection with the current contract, imposing additional costs on the Government.  *See* AR 5137, 5189.  Fourth, Kelsey-Seybold encountered difficulties in management of a subcontractor for ambulance services.  *See* AR 5137, 5192.

[9] The SEB also identified three "Weaknesses" with Wyle's Management Approach.  *See* AR 5037, 5137, 5151-54.  First, Wyle failed to meet the statement of work requirement for Registered Nurses in the Occupational Medical Clinic.  *See* AR 5151-52.  Second, Wyle failed to meet the staffing requirements for the Starport Fitness Center.  *See* AR 5154.  Third, Wyle submitted a Small Disadvantaged Business Plan, containing erroneous data.  *See* AR 5153-54.  As a consequence, the SEB questioned Wyle's ability to meet the required Small Disadvantaged Business Goals.  *Id.*

[10] The SEB, however, identified Wyle's Safety, Health, and Environmental Compliance Plan as a "Strength."  *See* AR 5136 ("Well developed Safety, Health, and Environmental Compliance Plan demonstrates a clear understanding of the requirements for successful operations at JSC.").

*See* AR 5121.  The overall rating for the Mission Suitability Factor was "Very Good" with a score of [deleted]/1,000.  *Id.*

With regard to the Cost Factor, Wyle's proposed cost was $[deleted] and the probable cost, determined by the cost-realism analysis, was $[deleted].  *See* AR 5117.

### b.    Comprehensive Health Services, Inc.

The SEB rated CHS's Past Performance Factor as having one "Significant Strength;" three "Strengths;" and one "Weakness."  *See* AR 5046, 5111-13.  This corresponded to an adjectival rating of "Excellent."  *See* AR 5033, 5121.

CHS's Mission Suitability Factor was rated as having:  four "Significant Strengths;" five "Strengths;" and one "Weakness" in the Management Approach Subfactor;[11] one "Significant Strength" and seven "Strengths" in the Technical Approach Subfactor; one "Significant Strength" in the Safety and Health Plan Subfactor;[12] and no strengths or weaknesses on the Small Disadvantaged Business Participation Subfactor.  *See* AR 5132-37; *see also* AR 5193-239.  The SEB assigned the following numerical and adjectival ratings for these subfactors:

| Subfactor | Point Score | Adjectival Rating |
|-----------|-------------|-------------------|
| Management Approach | [deleted] | Very Good |
| Technical Approach | [deleted] | Excellent |
| Safety and Health Plan | [deleted] | Excellent |
| Small Disadvantaged Business Participation | [deleted] | Good |

---

[11] CHS's Management Approach Subfactor was assigned a "Weakness," because CHS proposed to use a temporary doctor, if the proposed lead physician had not received a Texas medical license at the time contract performance was to commence.  *See* AR 5137.  The SEB reported that "the licensing of the [sic] Dr. Janczewski is being aggressively pursued . . . and investigation into his record in other states shows no reason that a Texas medical license should not be granted."  AR 5202.  The SEB, however, indicated that this presents some level of risk that "could result in less than adequate contract performance."  AR 5137.  CHS's proposed lead physician received a Texas medical license on October 3, 2005.  *See* AR 5401.  CHS forwarded this information to the NASA Contracting Officer on October 4, 2005.  *See* AR 5398-400.

[12] The SEB assigned CHS's Safety, Health, and Environmental Compliance Plan a "Significant Strength."  *See* AR 5136 ("The offeror provides an excellent Safety, Health[,] and Environmental Compliance Plan that is fully developed and ready for immediate implementation.");  *see also* AR 5231.

12

*See* AR 5121.  The overall rating for the Mission Suitability Factor was "Very Good" with a score of [deleted]/1,000.  *Id.*

With regard to the Cost Factor, CHS's proposed cost was $[deleted] and the probable cost, determined by the cost-realism analysis, was $[deleted].  *See* AR 5118.

### 2.    The Source Selection Authority's Dissatisfaction With The Evaluation Of The Safety And Health Approach Subfactor.

After the SEB Chairman's September 12, 2005 presentation, the Source Selection Statement reflected a concern about why there was a wide variance in the SEB's rating of Wyle's and CHS's Safety and Health Approaches:

> Wyle was assessed [by the SEB] a Good in the subfactor of Safety and Health Approach, and CHS was assessed an Excellent. . . .  In reading the detailed findings, it was not apparent . . . why there was such a discrepancy in the offerors' scores.  For example, the significant strength for CHS'[s] Safety Plan stated that the plan exhibited [a] "solid, comprehensive understanding of the requirements," whereas the strength for Wyle's proposal indicated that it "provided a . . . comprehensive . . . plan that meets the requirements[.]"  Whereas CHS'[s] Safety Plan included a "strong continuous improvement emphasis" and addressed "specific contract related concerns along with the required mitigation and actions," Wyle's Safety Plan demonstrated "a highly developed insight into . . . training needs," along with demonstrating "a high state of readiness to implement a safety and health program at high quality levels."

> In further questioning the [Source Evaluation] Board members regarding the distinction between the two Safety Plans, they were largely unable to articulate a measurable separation that corresponded in degree to the substantial adjective and point differences the Board had assigned in quality between them, other than to indicate that they considered CHS'[s] emphasis on continuous improvement to be important.  However, [the SEB] also discussed that Wyle proposed to maintain its superior rating with respect to its VPP status,[13] which . . . indicates that there was at

---

[13] The Solicitation provided that the awardee "shall fully support the JSC Safety and Health (S&H) OSHA VPP efforts and continue operation of the JSC's certified program, . . . [and] shall provide health program support for any onsite contractor attempt at OSHA VPP recognition."  AR 25.  In addition, the Solicitation provides that the awardee "is highly encouraged to pursue VPP 'Star' certification."  *Id.*

The U.S. Department of Labor, Occupational Safety & Health Administration ("OSHA")'s Voluntary Protection Program ("VPP") "promote[s] effective worksite-based safety and health."  OSHA Voluntary Protection Program, U.S. Dep't of Labor, Occupational Safety & Health Admin., *available at* http://www.osha.gov (last visited May 31, 2006); *see also* 65 Fed. Reg. 45,650

least an implied commensurate commitment on the part of Wyle to take the steps necessary (including any necessary improvements), to successfully do so.

AR 617-18 (certain alterations in original & footnote inserted).  As a result, the Source Selection Statement further explained that the SSA directed the SEB to re-evaluate the Safety and Health Approach Subfactor, with the assistance of a new independent safety expert:

> Taking all of this discussion into account, I was therefore of the opinion that the Board either had not adequately evaluated the Safety Plans, or had not fully articulated an otherwise accurate evaluation.  Accordingly, I requested the Board to take a fresh look at the Safety Plans (including obtaining the views of an independent safety expert who would be appointed an *ex officio* member of the SEB), and to report their results to me.

AR 618 (italics added).  The SSA directed that a second *ex-officio* safety and health expert be appointed the SEB to assist with the re-evaluation.  *See* AR 5498-99.  In response, the Safety and Mission Assurance Directorate appointed the Assistant for Operation ("the *ex-officio* member"), to assist the SEB.  *See* AR 5503.

### 3.    The September 14, 2005 Re-Evaluation.

As directed, the SEB re-evaluated the Safety and Health Plan Subfactor with the input from the *ex-officio* member.  *See* AR 618.  On September 14, 2005, the SEB Chairman again met with the SSA and presented the results of the re-evaluation of the Safety and Health Approach Subfactor, wherein Wyle's Safety and Health Plan rating was changed, from one "Strength," to one "Significant Strength" and two "Strengths."  *Compare* AR 5136, *with* AR 5025-27.[14]  The SEB also changed CHS's rating, from one "Significant Strength," to one "Significant Strength" and three "Strengths."  *Compare* AR 5136, *with* AR 5029-31.[15]  In addition, the SEB revised the numerical ratings of the

---

(July 24, 2000) ("Approval into VPP is OSHA's official recognition of the outstanding efforts of employers and employees who have achieved exemplary occupational safety and health.").  *Id.*  OSHA has three VPP distinctions:  "Star;" "Merit;" and "Star Demonstration."  *Id.*

[14] As a result of the re-evaluation, the SEB made two additional findings:  classifying Wyle's training plan as a "Significant Strength;" and discussing Wyle's understanding of hazard analysis and identification as a "Strength."  *See* AR 5026-27.  The SEB also restated the prior finding that Wyle's Safety, Health, and Environmental Compliance Plan was a "Strength."  *See* AR 5027.

[15] After the re-evaluation, the SEB identified CHS's Plan to obtain VPP Star status within one year after commencing performance under the OMOH Contract as a "Significant Strength."  *See* AR 5030.  The SEB, however, changed the prior finding that CHS's Safety, Health, and Environmental Compliance Plan was a "Significant Strength" to a finding that the Plan was only a "Strength."  *Compare* AR 5100, *with* AR 5031.  The SEB also noted two additional CHS

Safety and Health Plan Subfactor: Wyle was increased from [deleted] to [deleted] and CHS was reduced from [deleted] to [deleted], so that both were rated "Very Good." *See* AR 5033; *see also* AR 5121. The overall rating for Wyle's Mission Suitability Factor increased from [deleted] to [deleted]. *Id.* The overall rating for CHS's Mission Suitability Factor decreased from [deleted] to [deleted]. *Id.*

## D.     The Source Selection Statement.

The applicable regulations require that the SSA sign a Source Selection Statement before the award of the OMOH Contract that "clearly and succinctly justifies the selection." NASA FAR Supp. 1815.308(2). Therefore, on October 25, 2005, the SSA issued a Source Selection Statement based on a "qualitative assessment of the benefits to the Government arising from the strengths as well as the risk to successful contract performance represented by the remaining weaknesses." AR 608; *see also* AR 605-20. The SSA "focuse[d] on findings . . . found to be discriminators during . . . deliberations in making [the] source selection decision." *Id.* The Source Selection Statement also included the SSA's analysis of the four Subfactors for the Mission Suitability Factor, *i.e.*, Management Approach, Technical Approach, Safety and Health Plan, Small Disadvantaged Business Participation Plan, as well as the Past Performance and Cost Factors. *Id.*; *see also* AR 314-32, 361-64.

### 1.     Analysis Of The Technical Approach Subfactor.

The SSA first analyzed the Technical Approach Subfactor of the Mission Suitability Factor and concluded that "from a quantitative standpoint, Wyle and CHS were rated as Excellent, because both companies were relatively close in numerical scores." *Id.* The SSA then evaluated each "Strength" and "Significant Strength" to determine whether there was a competing counterpart. *See* AR 609. Those that did not have a competing counterpart were considered discriminators. *Id.*

The SSA decided that Wyle had several "Significant Strengths" that were discriminators: "numerous proposed technical enhancements;" "a multi-faceted data integration plan, which will allow significantly improved access to and interoperability of the data;" and an "excellent risk matrix that demonstrated a clear understanding of the work and associated risk issues[.]" *Id.* As a discriminating "Strength," the SSA was impressed with Wyle's understanding of treating workplace injuries and illnesses and establishing workgroups with other onsite industrial hygiene operations. *See* AR 609-10. On the other hand, CHS had a discriminating "Significant Strength," *i.e.*, "a highly effective understanding of the information technology (IT) needs of the contract," because CHS planned to use "occupational health nurses to perform certain physicals[,]" "a hyperbaric medicine physician who is a leading and recognized expert in the field," and "proposed to hire expert consultants for the environmental health laboratory and for safety and health training." AR 610.

---

"Strengths:" management's commitment to the overall safety and health culture; and a tracking and reporting capability for hazards and lessons learned. *Id.*

The SSA concluded, however, that "there was a much greater qualitative disparity between the two proposals in the Technical Approach [S]ubfactor than the [SEB's] adjective and point ratings convey[.]" AR 611.   Accordingly, the SSA "determined that the proposal of Wyle enjoyed a substantial advantage to the Government over that of CHS in [the Technical Approach] [S]ubfactor." *Id.*

## 2. Analysis Of The Management Approach Subfactor.

The SSA next analyzed the Management Approach Subfactor of the Mission Suitability Factor. *Id.*

### a. "Weaknesses."

The SSA began the analysis with a consideration of the "Weaknesses" of both proposals. *Id.*

#### i. Wyle Laboratories, Inc.'s Proposal.

The first "Weakness" of Wyle's proposal was identified as the proposal to use licensed vocational nurses ("LVN's"), instead of RN's. *Id.*   The SSA questioned the SEB about this "Weakness," because Wyle represented in the final proposal revision that it would "meet the contract requirement and staff the clinic with registered nurses." *Id.*   The SSA also noted that the basis of Wyle's estimate included LVN's, but determined the proposal to use LVN's was "inadvertent." *Id.* Accordingly, the SSA "did not attach much weight to this [W]eakness." *Id.*   The second identified "Weakness" in Wyle's proposal was an "inconsistency in the dollar values of subcontracts listed in a particular table contained in the proposed Subcontracting Plan." *Id.*   Again, the SSA considered this only an "editorial error." *Id.*   The third identified "Weakness" was "a failure to provide adequate staffing for the Starport Fitness Center." AR 612.   And, again, the SSA did not consider this "Weakness" "to be of great importance," since it could be corrected if Wyle was awarded the OMOH Contract. *Id.*

#### ii. Comprehensive Health Services, Inc.'s Proposal.

In contrast, the SSA was concerned about CHS's proposal "to utilize a licensed physician temporarily for fulfilling Texas' medical licensing requirements for the lead physician pending the proposed permanent lead physician obtaining a Texas license." *Id.*   The SEB considered this plan "less than optimal," but found this "Weakness" "to be of greater weight than the Board concluded." *Id.*   The SSA concluded that "[t]o have the role of lead physician filled by a temporary placeholder could adversely impact contract performance at the crucial time of contract phase-in and transition, when the effort is already vulnerable to disruption and a diminution in quality" and that "this [W]eakness cannot be corrected until and unless Texas issues the necessary medical licenses to the proposed individuals." *Id.*

16

### b.   "Strengths" And "Significant Strengths."

Next, the SSA compared the "Strengths" and "Significant Strengths" of both proposals.  *Id.*

### i.   Wyle Laboratories, Inc.'s Proposal.

Wyle proposed a manager with "over 20 years of directly related experience as a civil servant, with the current OMOH incumbent, and as program manager of the former JSC Life Sciences contract."  *Id.*  The proposed program manager also "ha[d] multiple professional associations and contacts which will be of great value to the OMOH contract" and "all references were very positive," because CHS's manager "is certified in occupational health, industrial hygiene, and safety, and has extensive experience in occupational and emergency medicine" and with "this combination of knowledge and demonstrated skills will ensure successful contract performance." AR 612-13.  Although both proposed managers had the necessary credentials and skills, Wyle's proposed manager was determined to offer "greater value to the government because of his directly relevant management experience as a member of the JSC community." AR 613.  In addition, Wyle "proposed a cadre of Key Personnel," of which all but one "are incumbents who have multiple years of proven high quality experience and demonstrated performance."  *Id.*  On this basis, the SSA concluded that "this [S]ignificant [S]trength is of great value to the Government[,] . . . [and CHS] did not have a comparable strength in this area."  *Id.*

Wyle also proposed a "workable plan for both short and long-term backup for physicians in the Occupational and Flight Medicine Clinics[,] . . . which had no counterpart in the CHS proposal." *Id.*  The SSA noted that this "Significant Strength" is "of notable value to the Government in that . . . Wyle dramatically increases its ability to meet and exceed the Government's requirements for sustained quality medical services."  *Id.*  Moreover, the proposed structure and implementation of Wyle's communication plan contemplated "using automated tools [that] ensures timely, efficient information flow through utilization of a web-based tool for distributing a wide array on contract reportable and wellness data."  *Id.*  The SSA considered this valuable, because "it is [a] proactive approach [that] will improve communications, thus reducing the potential for disruptions, improper or inadvisable actions, and delays due to misunderstanding or lack of information." AR 613-14.  The SSA concluded that CHS had no comparable strength in this respect.  *Id.*

In addition, Wyle received a "Significant Strength" for organizational structure, because it addressed "functional synergisms designed to enhance communication, as well as cross training and cross utilization of personnel are clear . . . and the required management levels of responsibility for different actions." AR 614.  The SSA concluded that "this is highly beneficial to the Government, because the clear depiction of these functions indicates that the Wyle team has a strong understanding of the work required."  *Id.*  The Wyle organizational structure also "proposed a team of individuals to promote and monitor excellent performance," and would "continuously manage the contract data stream from the operations within the contract."  *Id.*  The SSA concluded that this also was of value to the Government, as it afforded a "single point of contact for contract and program information."  *Id.*

17

The Wyle proposal also received a "Significant Strength" for the Total Compensation Plan, because the attractive benefits proposed will "ensure that highly skilled and qualified personnel will be recruited, hired and retained." AR 614-15. The CHS Total Compensation Plan was rated as a "Strength" for "generous vacation time and comprehensive life insurance, as well as a [S]trength for immediate fringe benefit coverage." AR 615. The SSA concluded, however, that the Wyle proposal was excellent from the beginning, whereas the CHS plan had been "driven to a higher level through discussions." *Id.*

### ii. Comprehensive Health Services, Inc.'s Proposal.

CHS proposed to use "subcontractors that specialize in their proposed areas of responsibility." *Id.* In contrast, the Wyle proposal also contained a "Strength" by using "the corporate competencies of the individual team members which are well suited to the proposed areas of responsibility." *Id.* The SSA, however, determined that Wyle's "Strength" did not "rise to the same level of significance . . . because one of the team members did not have relevant past performance." *Id.* Therefore, the SSA "concluded that the CHS proposal offered a greater value to the Government in this area." *Id.*

CHS also received a "Significant Strength" for the proposed Phase-In Plan, as did the Wyle proposal. *Id.* The SSA concluded that although the SEB found the CHS plan to be superior, upon a closer look at the detailed findings, there was no substantial difference between the two. *See* AR 615-16. In addition, taking into account the uncertainty of the lead physician's Texas medical license, the SSA concluded that the two Phase-In Plans were equal. *Id.*

In addition, the CHS proposal received a "Significant Strength" for a comprehensive Conflict of Interest Mitigation Plan, however, the Wyle proposal also received a "Strength" in this area. *See* AR 616. Although the SSA found little difference between the substance of the two proposals, the SSA concluded that CHS's plan was more comprehensive and detailed. *Id.*

Another "Strength" of the CHS proposal was the plan to obtain Occupational Safety and Health Administration's VPP "Star" Site recognition within the first year of performance. *Id.* The SSA determined that this would be of value to the Government and that Wyle had no comparable strength, except that "Wyle and its major team member currently enjoy VPP status onsite." *Id.*

### c. Overall.

In conclusion, the SSA by "reviewing, comparing and contrasting all of the [S]ignificant [S]trengths, [S]trengths, and remaining [W]eaknesses between the two competitors," determined that "the relative adjective ratings of Excellent for Wyle and Very Good for CHS represented real and measurable difference between them." *Id.* Accordingly, the SSA concluded that in the Management Approach Subfactor "Wyle had a clear advantage over CHS." AR 617.

18

### 3.     Analysis Of The Small Disadvantaged Business Plan Subfactor.

The third SSA evaluation was of the Small and Disadvantaged Business Plan Subfactor of the Mission Suitability Factor. *Id.* Here, the SSA found that the SEB did not identify any strengths or weaknesses for CHS. *Id.* In contrast, the SEB determined that Wyle's proposal had one "Weakness" of "inconsistent data [that] prevented the Board from making a meaningful assessment of the data." *Id.* After consulting with the SEB, however, the SSA decided that the inconsistent data was an "editorial [W]eakness" and not a "substantive [W]eakness." *Id.* Accordingly, the SSA concluded that the two proposals essentially were equal with respect to the Small Disadvantaged Business Plan Subfactor. *Id.*

### 4.     Analysis Of The Safety And Health Plan Subfactor.

On September 12, 2005, the SSA directed the SEB to re-evaluate the Safety and Health Plan Subfactor of the Mission Suitability Factor with an independent safety expert. *See* AR 618. After the SEB did so, the SEB Chairman reported the findings to the SSA on September 14, 2005. *Id.* The SSA observed in the Source Selection Statement that he was:

> satisfied that [the results of the re-evaluation] reflected a more accurate representation of the relatively close value of the Safety Plans than the original findings had conveyed. In further discussing the matter with the Board members [on September 14, 2005], they indicated to me that they were individually and collectively more confident that the re[-]evaluation was a more sound analysis than they had first conducted, and therefore of greater fidelity to the contents of the plans.

AR 619.

In the re-evaluation, Wyle had "one [S]ignificant [S]trength and two [S]trengths[,] and the subfactor was rated as Very Good overall[:]" the "Significant Strength" was an "excellent safety and health training program;" and the "Strengths" were that the "Safety Plan demonstrated a clear understanding of the requirements for successful, safe operations at the JSC," and "demonstrated a very good understanding of hazard analysis and identification." AR 618. The CHS proposal, however, "was scored somewhat higher, but was also rated Very Good overall, with one [S]ignificant [S]trength and three [S]trengths," including a plan for obtaining VPP Star status within one year of performance. *Id.* In sum, CHS's Safety and Health Plan Subfactor strengths revealed "an excellent Safety Plan," a commitment to "JSC's safety and health culture," and "a proposed tracking and reporting capability for hazards and lessons learned." *Id.*

Therefore, the SSA concluded that although the two plans were comparable, CHS's plan "would improve the JSC safety culture to a somewhat greater extent than Wyle's plan." AR 619.

### 5.     Analysis Of The Past Performance Factor.

As to the Past Performance Factor, the SSA also observed that both companies were rated as "Excellent," however, Wyle had "greater experience with large dollar value contracts." *Id.* In addition, Wyle proposed to use the incumbent contractor, Kelsey-Seybold, as a subcontractor for "a multitude of OMOH activities." *Id.* Kelsey-Seybold "has held . . . [a] directly relevant position with consistently excellent results, for many years at JSC." *Id.* Accordingly, the SSA concluded that Wyle's "past performance offered a greater value to the Government." *Id.*

### 6.     Analysis Of The Cost Factor.

The SSA also compared the Cost Factor of the two proposals, but again decided there was a negligible difference between the estimated costs and the Cost Factor was not "worthy of further consideration as a discriminator between the two proposals." *Id.*

### E.     The Source Selection Authority Selects Wyle Laboratories, Inc.'s Proposal As The "Best Overall Value To The Government."

Finally, the Source Selection Statement concluded that although the "competitors might appear to be at a dead heat, . . . [after] conducting [an] in-depth review of all the findings for both offerors, [NASA] is confident that there are true discriminators . . . which give Wyle the clear advantage." AR 620. Therefore, the SSA selected Wyle's proposal as the "best overall value to the Government." *Id.* On October 28, 2005, NASA awarded Contract No. NNJ05064093R to Wyle, at an estimated cost of $[deleted]. *See* AR 605-620, 5402-03.

## II.  PROCEDURAL BACKGROUND

On November 10, 2005, CHS filed a Complaint in the United States Court of Federal Claims, pursuant to 28 U.S.C. §§ 1491(a)(1), (b)(1).

On November 10 and 14, 2005, the court convened telephone conferences to discuss a proposed briefing and hearing schedule.  Pursuant to the parties' request, the court entered a Protective Order on November 15, 2005.  On November 15, 2005, the court entered a Scheduling Order.  On November 17, 2005, Wyle filed a Motion to Intervene, pursuant to RCFC 24(a).  On November 17, 2005, the court granted Wyle's Motion to Intervene.  On November 17, 2005, the Government filed the Administrative Record.

On November 22, 2005, CHS filed a Motion for Judgment on the Administrative Record. On November 23, 2005, the Government supplemented the Administrative Record by leave of the court.  On November 30, 2005, the Government filed a Cross-Motion for Judgment on the Administrative Record.  On November 30, 2005, Wyle filed a Response to CHS's Motion for Judgment on the Administrative Record.

On December 1, 2005, the court held an Oral Argument.

On December 14, 2005, CHS filed an Amended Complaint and a Supplemental Brief.  On December 22, 2005, the Government filed a Supplemental Response Brief and a Cross-Motion to Supplement the Administrative Record.  On December 22, 2005, Wyle filed a Supplemental Response Brief.  On December 29, 2005, CHS filed a Supplemental Reply Brief and an Opposition to the Government's December 22, 2005 Motion to Supplement the Administrative Record.  On January 4, 2006, the Government filed a Reply to CHS's December 29, 2005 Opposition.

## III. DISCUSSION

**A.   Jurisdiction.**

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (Jan. 3, 1996), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

The United States Court of Federal Claims also has "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States[.]"  28 U.S.C. § 1491(a)(1).  Since the Tucker Act only serves as a "jurisdictional statute[,] it does not create any substantive right enforceable against the United States for money damages."  *United States* v. *Testan*, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff must identify and plead an independent contractual relationship for the court to have jurisdiction.  *See Todd* v. *United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Trauma Serv. Group* v. *United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("To show jurisdiction . . . [a plaintiff] must show that either an express or implied-in-fact contract underlies its claim.").

The Amended Complaint alleges that NASA's award of the OMOH Contract to Wyle violates applicable procurement statutes and regulations, lacks a rational basis, and breaches an implied duty of good faith, fair dealing, and honest consideration.  *See* Amend. Compl. ¶¶ 1-4, 42-43, 45, 47-48, 50-51, 53-55, 57, 59, 61-62, 64-65, 67-68, 70; *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) ("Under the APA, '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'" (quoting 5 U.S.C. § 702)); *Southfork Sys., Inc.* v. *United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998) (quoting *United States* v. *John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir.1983) (*en banc*)) ("The jurisdictional basis for such suits is the alleged breach of 'an implied contract to have the involved bids fairly and

21

honestly considered.'"").  Therefore, the court has determined that it has jurisdiction to adjudicate the claims alleged in the Amended Complaint.

**B.    Standing.**

**1.    Plaintiff Comprehensive Health Services, Inc.**

**a.    Comprehensive Health Services, Inc. Is An "Interested Party."**

As a threshold matter, a protester to an award of a contract must establish that it is an "interested party."  28 U.S.C. § 1491(b)(1).  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act, 31 U.S.C. § 3551.[16]  *See Rex Serv. Corp.* v. *United States*, No. 05-5142, ___ F.3d ___, 2006 WL 1214967, at *1, 2006 U.S. App. LEXIS 11349, at *4 (Fed. Cir. May 8, 2006); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract").  A two-part test is applied to determine whether a protester is an "interested party:"  the protestor must show that it was an *actual or prospective bidder*; and the protester must have a *direct economic interest* in the procurement.  *See Rex Serv. Corp.*, 2006 WL 1214967, at *1-*2, 2006 U.S. App. LEXIS 11349, at *5 ("[T]o come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.") (citations omitted); *see also Am. Fed'n Gov't Employees, AFL-CIO* v. *United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("We . . . hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

On April 25, 2005, CHS submitted a Response to Request for Proposal No. NNJ05064093R. *See* AR 605, 621-2160.  On July 13, 2005, the SEB determined that only two of the proposals were in a competitive range:  CHS and Wyle.  *See* AR 4769, 4803; *see also* AR 606, 4396.  On September 12, 2005, the SEB Chairman presented findings to the SSA, in which CHS's proposal received a higher final score than Wyle's proposal:

---

[16] The term "'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).

| | Mission Suitability | Final Score | Past Performance | Probable Cost | Confidence Level |
|---|---|---|---|---|---|
| CHS | Very Good | [deleted] | Excellent | $[deleted] | HIGH |
| Wyle | Very Good | [deleted] | Excellent | $[deleted] | HIGH |

*See* AR 5122.

The following chart summarizes the results that the SEB presented to the SSA on September 12, 2005:

| | Wyle | | | CHS | | |
|---|---|---|---|---|---|---|
| | Ranking | Score | % | Ranking | Score | % |
| Management Approach | Excellent | [deleted] | [deleted] | Very Good | [deleted] | [deleted] |
| Technical Approach | Excellent | [deleted] | [deleted] | Excellent | [deleted] | [deleted] |
| Safety and Health Plan | Good | [deleted] | [deleted] | Excellent | [deleted] | [deleted] |
| Small Disadvantaged Business | Good | [deleted] | [deleted] | Good | [deleted] | [deleted] |
| TOTAL | Very Good | [deleted] | [deleted] | Very Good | [deleted] | [deleted] |
| Past Performance | Excellent | | | Excellent | | |

*See* AR 5121.

Thereafter, the SSA directed the SEB to re-evaluate the Safety and Health Plan Subfactor of both proposals.  *See* AR 618.  In response, the SEB presented revised findings to the SSA on September 14, 2005, wherein Wyle's rating increased by 20.5 points and CHS's rating decreased by 15 points:

|  | Mission Suitability | Final Score | Past Performance | Probable Cost | Confidence Level |
|---|---|---|---|---|---|
| Wyle | Very Good | [deleted] | Excellent | $[deleted] | HIGH |
| CHS | Very Good | [deleted] | Excellent | $[deleted] | HIGH |

*See* AR 5034.  As a consequence, Wyle's final score was now higher than CHS's final score.  *Id.*

The following chart summarizes the results that the SEB presented to the SSA on September 14, 2005:

|  | Wyle | | | CHS | | |
|---|---|---|---|---|---|---|
|  | Ranking | Score | % | Ranking | Score | % |
| Management Approach | Excellent | [deleted] | [deleted] | Very Good | [deleted] | [deleted] |
| Technical Approach | Excellent | [deleted] | [deleted] | Excellent | [deleted] | [deleted] |
| Safety and Health Plan | Very Good | [deleted] | [deleted] | Very Good | [deleted] | [deleted] |
| Small Disadvantaged Business | Good | [deleted] | [deleted] | Good | [deleted] | [deleted] |
| TOTAL | Very Good | [deleted] | [deleted] | Very Good | [deleted] | [deleted] |
| Past Performance | Excellent |  |  | Excellent |  |  |

*See* AR 5033.

On October 28, 2005, the SSA awarded the OMOH Contract to Wyle.  *See* AR 605-20, 5402-03.  As the first runner-up, CHS has a "direct economic interest" in the award of the OMOH Contract and, therefore, is an "interested party."  *See* AR 619-20, 5033-34; *see also Am. Fed'n Gov't Employees*, 258 F.3d at 1302 ("We hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

24

###### b.   Comprehensive Health Services, Inc. Had A "Substantial Chance" Of Being Awarded The Contract.

To prevail, a disappointed bidder must provide evidence of "a significant error in the procurement process, but also that the error prejudiced it." *See Galen Med. Assocs., Inc.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). The United States Court of Appeals for the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("In order to establish standing, ITAC must show that it is an 'actual or prospective bidder[ ] or offeror[ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract,' *i.e.,* that ITAC was an interested party, *prejudiced* by the award to RSIS." (alterations in original & emphasis added)).

To establish prejudice, a disappointed bidder also must show that there was a "substantial chance" it would have received the contract award but for the alleged error. *See Galen Med. Assocs.,* 369 F.3d at 1331; *see also Emery Worldwide Airlines, Inc.* v. *United States,* 264 F.3d 1071, 1086 (Fed. Cir. 2001) ("To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, 'there was a *substantial chance* it would have received the contract award.'" (emphasis added)) (citation omitted); *Alfa Laval Separation, Inc.* v. *United States*, 175 F.3d 1365, 1368 (Fed. Cir. 1999) ("A protester demonstrates prejudice by showing 'that there was a *substantial chance* it would have received the contract award' if the government had not violated the law." (emphasis added)); *Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) ("Thus, for [plaintiff] to prevail it must establish not only some significant error in the procurement process, but also that there was a *substantial chance* it would have received the contract award but for that error." (emphasis added)).

The "substantial chance" test reflects a "reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error during the procurement process have a forum available to vent their grievances." *Data Gen. Corp.*, 78 F.3d at 1563. Panels of the United States Court of Appeals for the Federal Circuit, however, have taken different approaches regarding the evidence required to satisfy the "substantial chance" test in a bid protest case. *Compare Info. Tech. & Applications*, 316 F.3d at 1319 (holding that a protestor must establish "that its chance of winning the award was 'greater than . . . insubstantial . . . if successful on the merits of the bid protest'"), *with Alfa Laval,* 175 F.3d at 1367 (holding that a protester is not required to show that, but for the alleged error, the protester would have been awarded the contract; instead a protester must show there was a 'substantial chance' it would have received the contract but for the alleged error), *with Data Gen. Corp.*, 78 F.3d at 1562-63 (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract.   This is a refinement and clarification of the 'substantial chance' language[.]"); *cf. United States* v. *Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1011 (Fed. Cir. 1990)

("[O]nly the second-lowest bidder has a direct economic interest in the award of the contract. Therefore, only the second-lowest bidder is an interested party entitled to protest the award of the contract, . . . because only it stands to receive the contract in lieu of the challenged awardee[.]") (internal citation omitted).  Assuming *arguendo* that the highest "prejudice" standard is applicable in this case, nevertheless, CHS can meet this standard since CHS's proposal initially was rated higher than Wyle's proposal.  *See* AR 618-20, 4432-33, 5033-34.

At the core of CHS's Amended Complaint is the allegation that the SSA improperly directed the SEB to re-evaluate the Safety and Health Plan Subfactor.  As a consequence, Wyle's Safety and Health Plan Subfactor rating was increased.  *See* AR 5033-34; *see also* AR 4432-34, 5121.  CHS's rating was reduced from "Excellent" to "Very Good" and the overall score was reduced by 15 points. In contrast, Wyle's rating was increased from "Good" to "Very Good," and the overall score was increased by 21 points.  *Id.*  The SEB's final scoring, however, resulted in a difference of only 8.5 points out of a possible 1,000 total points.  *See* AR 5034.  Therefore, the record evidences that but for the re-evaluation, CHS had a "substantial chance" of being awarded the OMOH Contract.  *See Galen Med. Assocs.,* 369 F.3d at 1331 (affirming the lower court's decision that but for the alleged errors, a first runner-up bidder has a substantial chance of receiving the award).  Accordingly, the court has determined that CHS has established prejudice to challenge NASA's action and award of the OMOH Contract to Wyle.

## 2.    Intervenor Wyle Laboratories, Inc.

On November 17, 2005, the court granted Wyle's November 17, 2005 Motion to Intervene as a Matter of Right, pursuant to Rule 24(a) of the United States Court of Federal Claims, that provides:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an *interest relating to the property or transaction which is the subject of the action* and the applicant is so situated that the *disposition of the action may* as a practical matter *impair or impede the applicant's ability to protect that interest*, unless the applicant's interest is adequately represented by existing parties.

RCFC 24(a) (emphasis added); *see also Am. Mar. Transp., Inc.* v. *United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989) ("Intervention is proper only to protect those interests which are of such a *direct* and *immediate* character that the intervenor will either gain or lose by the *direct* legal operation and effect of the judgment." (internal quotations & citations omitted)).  The United States Court of Appeals for the Federal Circuit has held that "the requirements for intervention are to be construed in favor of intervention."  *Am. Mar. Transp.,* 870 F.2d 1561 (citing *Westlands Water Dist.* v. *United States*, 700 F.2d 561, 563 (9th Cir.1983)).

Wyle also has "an interest relating to property . . . which is the subject of [this] action," because Wyle was awarded the OMOH Contract that CHS protests by this action.  Therefore, a final judgment in favor of CHS will "impair" Wyle's "ability to protect that interest."  RCFC 24(a).

The United States Court of Appeals for the Federal Circuit requires the trial court to evaluate three factors in determining whether an intervention is timely:  "(1) the length of time during which the would-be intervenor[s] actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor[s] by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted & certain alterations in original).  In this case, Wyle filed a Motion to Intervene seven days after CHS filed the Complaint.  Therefore, Wyle's Motion to Intervene was timely.  In addition, there is no evidence suggesting that Wyle's intervention in this action prejudiced the rights of other parties.

Therefore, the court has determined that Wyle has standing to intervene in this action to protect its interest in the OMOH Contract.

## C.    Relevant Standard For Decision.

### 1.    On Supplementing The Administrative Record.

When resolving a motion for judgment on the administrative record, "the focal point for judicial review 'should be the administrative record already in existence, not some new record made initially in the reviewing court.'"  *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L.* v. *United States*, 56 Fed. Cl. 502, 508 (Fed. Cl. 2003) (quoting *Camp* v. *Pitts*, 411 U.S. 138, 142 (1973) (per curiam); citing *Advanced Data Concepts* v. *United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)); *Banknote Corp.*, 365 F.3d at 1358 (holding that the trial court did not abuse its discretion in denying a motion to supplement the administrative record where the trial court determined that "the declaration contained no facts or arguments not already present in the administrative record").

The United States Court of Federal Claims' decision in *Cubic Applications, Inc.* v. *United States*, 37 Fed. Cl. 345, 350 (Fed. Cl. 1997), summarized the difficulty faced in reviewing a procurement decision on the administrative record:

As a practical matter, . . . in most bid protests, the "administrative record" is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review.  This is true in the contract award context if for no other reason than that, due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents.  In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and

27

possibly limited discovery, aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action.   It follows that discovery as well as the breadth of the court's review has to be tailored in each case.

*Id.*; *see also Orion Int'l Techs.* v. *United States*, 60 Fed. Cl. 338, 342 (Fed. Cl. 2004) ("In all but exceptional cases, the evidence in cases challenging *formal* agency rulemaking brought under the [APA] is limited to materials contained in the administrative record. . . . The record produced during a formal adjudication or rulemaking, however, is different from a record of an informal agency decision.   In the case of an informal administrative decision, such as the award of a contract, the administrative record is merely 'a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court.'" (internal citations & footnotes omitted)).   Accordingly, the United States Court of Federal Claims court does not "'apply an iron-clad rule automatically limiting its review to the administrative record.'"   *United Enter. & Assocs.* v. *United States*, 70 Fed. Cl. 1, 18 (Fed. Cl. 2006) (quoting *Graphic Data, LLC* v. *United States*, 37 Fed. Cl. 771, 779 (Fed. Cl. 1997)).

Supplementing the administrative record is appropriate where the record does not contain sufficient information for the court to render a decision.   *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1338-39 (Fed. Cir. 2001) ("[E]ven if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review."); *see also Precision Standard, Inc.* v. *United States*, 69 Fed. Cl. 738, 745 (Fed. Cl. 2006) ("In particular, the court will supplement the administrative record to fill gaps concerning the factors the contracting officer considered in reaching his decision."); *Asia Pac. Airlines* v. *United States*, 68 Fed. Cl. 8, 18 (Fed. Cl. 2005) ("Gaps in the administrative record may exist largely because of the informal nature of the agency's action. When an explanation of a contracting officer's decision is required for meaningful judicial review, a reviewing court has the power, and sometimes the obligation, to require such an explanation.").

Although neither the United States Supreme Court nor the United States Court of Appeals for the Federal Circuit have established a standard for supplementing the administrative record, decisions of the United States Court of Federal Claims have identified the threshold inquiry as whether an agency's action before the court is susceptible to a "record review."   *See United Enter.*, 70 Fed. Cl. at 18 ("[T]he judge should determine whether the agency action before the court is susceptible to a record review.   If the answer is yes, the judge must limit review to the record." (quoting *Al Ghanim*, 56 Fed. Cl. at 508; *GraphicData*, 37 Fed. Cl. at 780)).   If the court cannot make an informed review of the agency's decision, the court may allow the parties to supplement the administrative record.   *See Al Ghanim*, 56 Fed. Cl. at 508 ("If the answer is no, a party may supplement the administrative record when necessary to prove that evidence not in the record is evidence without which the court cannot fully understand the issues.").

2.      **On Judgment On The Administrative Record.**

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the APA, *i.e.*, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also Banknote Corp.*, 365 F.3d at 1350-51 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citation omitted)).  The United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either:  (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.,* 369 F.3d at 1329 (citations omitted); *see also Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that trial courts initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1351 ("In bid protest cases filed under the ADRA, the court implements this APA standard by applying the standard as previously interpreted by the district courts[.]"); *Info. Tech. & Applications*, 316 F.3d at 1319 ("We reapply the 'arbitrary and capricious' standard of [S]ection 706 of the Administrative Procedure Act to the . . . procurement decision.").

A "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa*, 238 F.3d at 1333 (citations omitted).  This burden is particularly great in a "negotiated procurement" such as the one at issue in this case. *Galen Med. Assocs.*, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests. . . .  The higher burden exists because the contracting officer engages in what is inherently a judgmental process." (citations & internal quotations omitted)); *see also American Tel. & Tel. Co.* v. *United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("[I]n a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations.").  The "decision to contract - - a responsibility that rests with the contracting officer alone - - is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment[.]" *Sperry Flight Sys.* v. *United States*, 548 F.2d 915, 921 (Ct. Cl. 1977).

Moreover, this burden is even greater where the procurement is a "best value" procurement, as is the case here. *Compare* AR 302 ("The Government intends to award a contract or contracts resulting from this [S]olicitation to the responsible offeror(s) whose proposal(s) represent the *best value* after evaluation in accordance with the factors and subfactors in the [S]olicitation." (emphasis added)), *with Galen Med. Assocs.*, 369 F.3d at 1330; *see also TRW, Inc.* v. *Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation

authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

Therefore, where the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted); *see also John C. Grimberg*, 702 F.2d at 1372 (holding that the court may interfere with the Government procurement process "only in extremely limited circumstances"). This standard recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

The court, however, is mindful that the agency must treat each offeror equally, applying a consistent standard for evaluating each proposal. *See PGBA, LLC* v. *United States*, 60 Fed. Cl. 196, 207 (Fed. Cl. 2004), *aff'd* 389 F.3d 1219 (Fed. Cir. 2004) ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion."). Therefore, the United States Court of Appeals for the Federal Circuit has recognized that the procuring agency is entitled to a presumption of good faith. *See Info. Tech. & Applications*, 316 F.3d at 1323 n.2 ("An agency decision is entitled to a presumption of regularity." (quoting *Impresa*, 238 F.3d at 1338)). Where bad faith is alleged, "the proof must be almost irrefragable." *Id.*; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("[W]hen a bidder alleges bad faith, in order to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable." (internal quotations and alterations omitted)). This is equivalent to the "clear and convincing evidence" standard. *See Galen Med. Assocs.*, 369 F.3d at 1330 (citing *Am-Pro Protective Agency, Inc.* v. *United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002)); *see also id.* ("In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff.") (citations omitted).

If a trial court finds that an agency's decision making fails an APA review, then the court must inquire if the bidder was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351. A claim on the merits of a bid protest will only succeed if both requirements are satisfied. *Id.*; *see also Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)).

The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 56.1,[17] is similar but not identical to a Motion for Summary Judgment, pursuant to RCFC

_____

[17] On March 3, 2006, the Clerk of the United States Court of Federal Claims issued a public notice of proposed changes to the Rules of the United States Court of Federal Claims. In part, the proposal seeks to supplant RCFC 56.1 by a new RCFC 52.1. The proposed RCFC 52.1(a) makes

56.  *See Bannum*, 404 F.3d at 1355.  The inquiry on a Motion for Summary Judgment is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment.  *See Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* RCFC 56.  In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is more limited, *i.e.*, given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law.  *See Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record"); *see also* RCFC 56.1.

---

provisions for the filing of the administrative record in certain cases.  *See* PROPOSED RULES, U.S. COURT OF FED. CLAIMS (Mar. 3, 2006), *available at* 69 Fed. Cl. No. 5, at Ct.R-3 ("In all cases in which action by, and a record of proceedings before, an agency is relevant to a decision, the administrative record of such proceedings shall be certified by the agency or agencies and filed with the court. The court may by order, including a scheduling order entered pursuant to RCFC 16(b) and Appendix A or C, establish a time for filing the administrative record.").  The proposed RCFC 52.1(b) permits any party to "move for partial or other judgment on the administrative record" and sets forth the procedures to make such a motion.  *Id.* ("The parties may move for partial or other judgment on the administrative record filed with the court. Absent an order by the court setting a different procedure, in any such motion or supporting memorandum, the moving or crossmoving party shall include a Statement of Facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court. The opposing party shall include in any response a Counter-Statement of Facts that similarly draws upon and cites to the administrative record.").  The Rules Committee explained the reason for this proposed change:

> RCFC 52.1 has no FRCP counterpart. The rule replaces an earlier rule, RCFC 56.1, that applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed. . . .  Specifically, the now repealed Rule 56.1 did *not* adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact.  *See* RCFC 56(c). Nonetheless, despite this omission, parties, in moving for judgment on the administrative record under the prior rule, frequently would contest whether the administrative record showed the existence of a genuine dispute of material fact. To avoid this confusion, the new rule omits any reference to summary judgment or to the standards applicable to summary judgment.

*Id.*  The period for public comment closes on June 2, 2006.

**D.      The Court's Resolution Of The Parties' Motions.**

**1.      The Government's Motion To Supplement The Administrative Record.**

Although the Government asserts that the Administrative Record contains sufficient information for the court to determine that NASA's actions in this case were not unlawful, arbitrary or capricious, or lacked a rational basis, nevertheless, on December 22, 2005, the Government filed a Motion to Supplement the Administrative Record, together with three Declarations, addressing the re-evaluation of the Safety and Health Plan Subfactor:  [deleted], the SSA; [deleted], the *ex-officio* member; and [deleted], the SEB Chairman.   *See* Gov't Mot. to Supp. at 1-2; *see also id.* (Attachments 1-3).

CHS concedes that "[t]here is nothing in the Administrative Record that explains just what this so-called 'independent safety expert' said to, or reported to, the Source Evaluation Board[,]" but objects to the Declarations from the SSA, the SEB Chairman, and the *ex-officio* being made a part of the record.  *See* Pl. Supp. Reply Br. at 2-7.

The NASA FAR Supplement defines the SEB Chairperson as "the principal operating executive of the SEB."  NASA FAR Supp. 1815.370(d)(2).  CHS objects to the SEB Chairman's Declaration, because the Government "does not offer Declarations from the other five voting members of the Source Evaluation Board."  Pl. Supp. Reply Br. at 4 ("Although all six voting members of the Source Evaluation Board participated in the re-evaluation of September 14th, 2005, [NASA] does not explain why the Declaration of only one member of the Source Evaluation Board, and not the Declarations of all six voting members of the Source Evaluation Board, is offered. [NASA] here attempts to circumvent the consensus point scoring promised by the Evaluation Plan - - and such a circumvention of promised consensus point scoring warrants judicial intrusion to overturn an Award." (superscript in original)).  The fact that the Government could have offered additional declarations is not a reasoned basis for excluding this Declaration.

In fact, the Administrative Record contained no information about the re-evaluation, specifically the involvement of the *ex-officio*, any communication with the SEB, or specific procedures employed by the SEB to implement the re-evaluation.  In his Declaration, the SSA explains the steps taken to direct the SEB's re-evaluation of the Safety and Health Plan Subfactor, the process by which the new *ex-officio* member was appointed, and the fact that the SSA had no prior contact with the *ex-officio* member prior to the September 14, 2005 presentation.  *See* Gov't Mot to Supp. (Attachment 2).  In her Declaration, the *ex-officio* member details her relevant professional and educational background, explains how she was appointed and her lack of knowledge of the SEB's prior findings, and summarizes the assistance provided to the SEB and attendance at the September 14, 2004 presentation.  *Id.* (Attachment 1).  In his Declaration, the SEB Chairman discusses the assistance that the *ex-officio* provided to the SEB during the re-evaluation and details the SEB's subsequent discussions.  *Id.* (Attachment 3).

Without the information in the supplementary Declarations, the court has determined that it cannot make an informed determination as to whether the SSA unlawfully directed the SEB to re-

evaluate the Safety and Health Plan Subfactor or whether the SEB's re-evaluation was arbitrary, capricious, or lacked a rational basis.   For these reasons, the court has determined that the Government's Motion to Supplement the Administrative Record should be granted.   In reaching this conclusion, the court notes that CHS also could have provided counter supplementary Declarations to challenge those proffered by the Government.   CHS did not do so.

> 2.   **The Parties' Cross-Motions For Judgment On The Administrative Record.**

> > a.   **The Source Selection Authority Did Not Violate 10 U.S.C. § 2305(b)(1) Or Federal Acquisition Regulation 15.305(a)(2).**

The Amended Complaint alleges that NASA violated 10 U.S.C. § 2305(b)(1) and FAR 15.305(a)(2), because the SSA's decision was based on a subfactor not announced in the Solicitation. *See* Amend. Compl. ¶ 54; *see also* 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award *based solely on the factors specified in the solicitation*." (emphasis added)); 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").   Specifically, CHS asserts that "[t]he 'Source Selection Statement' accredits Wyle's Past Performances on 'large dollar value contracts' even though the Solicitation does not announce such a significant Subfactor."   *See* Pl. Br. at 31; *see also* Amend. Compl. ¶¶ 53, 55.

The SSA addressed the past performance of both offerors in the Source Selection Statement, and agreed with the SEB that both proposals were rated "Excellent."   *See* AR 619.   The SSA, however, observed that:

> In comparing the two offerors, including the detailed data supporting the findings, it was apparent that Wyle had a noticeable advantage over CHS.   Although both companies have a roughly equivalent volume of relevant experience and excellent references, it was noted that *Wyle has greater experience with large dollar value contracts, which are more comparable to the scale of the OMOH contract contemplated here*.   In addition, though not separately called out as a strength by the SEB, I noted that Kelsey-Seybold, Wyle's team member and proposed subcontractor for a multitude of OMOH activities, is the current OMOH contractor and has held that directly relevant position with consistently excellent results, for many years at [Johnson Space Center].   Although both Wyle and CHS are competent contractors capable of performing the OMOH effort, based on the SEB's and my own assessment of their relative strengths, I concluded that Wyle's past performance offered the greater value to the Government.

*Id.* (emphasis added).

The Source Selection Statement reflected that the SSA "was impressed by the substantive excellence exhibited by the Wyle team on a number of large dollar, *directly relevant contracts*, which offers greater value to the Government than the very able but more limited scope of the past

performance of CHS." AR 620 (emphasis added). The Source Selection Statement also reflected that the SSA considered whether the past performance involved "large dollar value contracts" *in order to ascertain how relevant the past performance was* to the OMOH Contract. *See* AR 619-20.

The Solicitation asked the offeror and subcontractors to identify up to five contracts from the last three years "that *demonstrate the offeror's ability to perform the OMOHC work*." AR 326 (emphasis added). The Solicitation further explained the significance of the Past Performance Factor in the evaluation:

> Past Performance indicates how well an offeror performed on *relevant earlier work* and can be a significant indicator of how well it can be expected to perform the work required under this procurement.

> Offerors' Past Performance, including relevant experience, will be evaluated separately by the SEB, but will not be numerically weighted and scored.

AR 363 (emphasis added). The words of the Solicitation, *i.e.*, "relevant earlier work," indicate that the agency was interested in assessing an offeror's prior experiences to determine whether the offeror could handle the demands of the proposed OMOH Contract. *See* AR 326, 363.

The United States Court of Federal Claims consistently has held that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote Corp. of Am., Inc.* v. *United States*, 56 Fed. Cl. 377, 387 (Fed. Cl. 2003), *aff'd Banknote Corp.*, 365 F.3d 1345, (quoting *Analytical & Research Tech.* v. *United States*, 39 Fed. Cl. 34, 45 (Fed. Cl. 1997)) (selected citations omitted); *see also Computer Scis. Corp.* v. *United States*, 51 Fed. Cl. 297, 309 (Fed. Cl. 2002); *Bean Stuyvesant, L.L.C.* v. *United States*, 48 Fed. Cl. 303, 321 (Fed. Cl. 2000); *T & S Prods., Inc.* v. *United States*, 48 Fed. Cl. 100, 105 (Fed. Cl. 2000). To evaluate an offeror's "relevant earlier work," an evaluator necessarily would have to assess the characteristics of the earlier work, such as the size of the project, the complexity of the project, the length of performance, and the skills demanded. *See Maint. Eng'rs* v. *United States*, 50 Fed. Cl. 399, 415 (Fed. Cl. 2001) ("An agency's consideration of whether the contractor's past performance included work on contracts of a similar size and complexity is a proper consideration in determining the degree to which the past contracts are relevant to the present evaluation." (citations omitted)).

Therefore, the court has determined that the SSA's decision did not violate 10 U.S.C. § 2305(b) or FAR 15.305(a)(2).

**b.      The Source Selection Authority Did Not Violate 10 U.S.C. § 2305(b)(4)(c) Or Federal Acquisition Regulations 15.303(b)(6) And 15.308.**

CHS's Motion for Judgment on the Administrative Record also argues that 10 U.S.C. § 2305(b)(4)(c) was violated, because the SSA did not accurately consider the most probable costs and,

34

therefore, "cannot properly have decided which of the competitive proposals was 'most advantageous to the United States[.]'" Pl. Br. at 30; *see also* Amend. Compl. ¶¶ 67-68; 10 U.S.C. § 2305(b)(4)(c) ("[T]he head of the agency shall award a contract with reasonable promptness to the responsible source whose proposal is most advantageous to the United States, *considering only cost or price and the other factors included in the solicitation*." (emphasis added)). CHS also asserts that the SSA violated FAR 15.303(b)(6) because, without a proper and accurate probable cost evaluation, there is no basis for the SSA's conclusion that Wyle's proposal was the best value to the Government. *See* Pl. Br. at 30; Amend. Compl. ¶¶ 67-68; *see also* 48 C.F.R. § 15.303(b)(6) ("The source selection authority shall . . . [s]elect the source or sources whose proposal is the best value to the Government[.]"). CHS also asserts that the SSA violated FAR 15.308 because, without a proper and accurate probable cost evaluation, the SSA failed to articulate the required rationale for any business judgments and tradeoffs in the Source Selection Statement. *See* Pl. Br. at 30; Amend. Compl. ¶¶ 67-68; *see also* 48 C.F.R. § 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.").

According to CHS, the SEB identified two "Weaknesses" regarding Wyle's proposal that "have significant probable cost impacts," *i.e.*, use of LVN's instead of registered nurses, as required by the Solicitation and Wyle's failure to provide the required staffing for the Starport Fitness Center. *See* Pl. Br. at 29-31. In light of these "Weaknesses," CHS estimated that Wyle's proposal was understated by $3.334 million.[18] *Id.* at 30. The Government and Wyle, however, correctly point out that neither of these "Weaknesses" had probable cost impacts that the SSA failed to address. *See* Gov't Cross-Mot. at 30; Int. Resp. at 15-16. [deleted]. *See* AR 4038-39. Consequently, the retention of LVNs had no cost effect on Wyle's proposal. As the SSA explained in the Source Selection Statement:

> [Wyle] had failed to meet a Statement of Work requirement for registered nurses in the Occupational Medical Clinic. In quizzing the members of the SEB in this respect, I learned that this [W]eakness had been conveyed to Wyle during discussions. Wyle's response was to state in its final proposal revision that it would meet the contract requirement and staff the clinic with registered nurses. However, Wyle's basis of estimate still referenced a licensed vocational nurse (LVN) for this area. I considered Wyle's correction of the [W]eakness in the text of its proposal to override the apparently *inadvertent* retention of the LVN in the basis of estimate. Accordingly, I did not attach much weight to this [W]eakness.

AR 611 (emphasis added).

---

[18] CHS asserts that these two "Weaknesses" had "significant probable cost impacts" that NASA failed to consider. The use of LVN's, instead of registered nurses, resulted in an understatement of $[deleted] million over the ten-year term of the OMOH Contract. *See* Pl. Br. at 30. The failure to provide required staffing for the Starport Fitness Center also resulted in an understatement of $[deleted] million over the ten-year term of the OMOH Contract. *Id.*

As to this issue, the court has determined that the SSA did not violate 10 U.S.C. § 2305(b)(4)(c), FAR 15.303(b)(6), or FAR 15.308 and had a rational basis for treating Wyle's proposed use of LVN's as a clerical error, because it did not have an effect on the overall cost of the Wyle proposal.

Second, the SEB found that: "Wyle proposed sufficient personnel overall such that the cost proposal did not need to be adjusted to accommodate one or two additional Fitness Center personnel." AR 612. Therefore, the SSA determined that this "Weakness" also did not have an effect on cost. *Id.* Moreover, CHS "presented no evidence to indicate that the Source Selection Authority's determination in this regard was unreasonable." Int. Resp. at 15. Accordingly, the court has determined that the SSA did not violate 10 U.S.C. § 2305(b)(4)(c), FAR 15.303(b)(6), or FAR 15.308 and acted reasonably with a rational basis, in declining to adjust Wyle's proposal to add additional personnel, since that error did not have an effect on the cost.

Assuming *arguendo* that the aforementioned "Weaknesses" had a probable effect on cost and the SSA should have adjusted the analysis and that the adjustment that CHS proposes is accurate, however, CHS nevertheless has failed to establish how it was prejudiced by these alleged errors, because the adjustment requested was insufficient to overturn the award to Wyle. *See* AR 364 ("Mission Suitability and Past Performance when combined are *significantly* more important than cost." (emphasis added)). As the Government illustrates, the magnitude of CHS's proposed adjustment is not significant when placed in context with the overall contract price:

> CHS's claim that the adjustments would have added approximately [deleted] to Wyle's cost over the ten-year term of the proposed OMOHC, even if accurate, is insufficient to overturn the award to Wyle. . . . $[deleted] out of $[deleted] amounts to the inconsequential amount of .026, or 2.6 percent of the proposal amount of $[deleted]. This alone is insufficient to overturn the award to Wyle.

Gov't Cross-Mot. at 30-31.

Therefore, the court has determined that the SSA did not violate 10 U.S.C. § 2305(b)(4)(c), FAR 15.303(b)(6), or FAR 15.308.

### c.     The Source Selection Authority Did Not Violate Federal Acquisition Regulation 15.305(a)(3).

Next, CHS argues that NASA violated FAR 15.305(a)(3), because the SEB did not explain the reason for the re-evaluation of the Safety and Health Plan Subfactor or adequately justify the changes made in Wyle's and CHS's ratings. *See* Pl. Supp. Br. at 6-9 ("An Undocumented Evaluation of Competitive Proposals Violates Procurement Statute and Regulation. . . . This Administrative Record, an Administrative Record in which the rescoring and re-rating of Comprehensive Health's Competitive Proposal on the Safety and Health Plan Subfactor is

36

unexplained, a rescoring and re-rating that results in Wyle displacing Comprehensive Health as the Offeror whose Competitive Proposal was highest-scored, demands the same result.").

Federal Acquisition Regulation 15.305(a)(3) requires:

When tradeoffs are performed (*see* 15.101-1), the source selection records shall include - -

(i) An assessment of each offeror's ability to accomplish the technical requirements; and

(ii) A summary, matrix, or quantitative ranking, *along with appropriate supporting narrative*, of each technical proposal using the evaluation factors.

48 C.F.R. § 15.305(a)(3) (emphasis added).

During the September 14, 2005 presentation to the SSA, the SEB explained the general framework that the SEB employed during the re-examination:

--      The Board reviewed both plans.

- -      An independent Safety & Health consultant was brought in for assistance.

- -      A caucus meeting was held to review the findings[.]

- -      The original findings were modified as required, and new findings were developed[.]

- -      The [B]oard re-scored the Safety & Health portion of mission suitability[.]

AR 5024.

The Declaration of the SEB Chairman also describes the new *ex-officio* member's involvement with the SEB's re-evaluation:

[deleted] was appointed as our new *ex officio* member.  She came to the secured facility in which we had conducted all of our evaluations.  We gave her a copy of relevant portions of the OMOH solicitation and the Wyle and CHS Safety Plans and asked her to independently review each of the S&H [("Safety and Health")] plans as stated in the RFP.  [deleted] was asked to compare each of the plans to the OMOHC Data Requirements Description for the S&H plan.  The Board members also independently reread the Safety and Health Plans.  Later, [deleted] met with the Board and presented her findings.  She told us that both offerors had prepared

37

acceptable Safety and Health Plans.  After she left, the Board met to discuss the
Safety and Health Plans, her input, our existing consensus findings, as well as new
individual findings.  [deleted] opinion as well as those of the SEB members were
used to develop the findings of the Board.  We felt that this activity provided a much
more realistic accounting of both offeror's S&H plans.

AR 5513-14 (¶ 10) (italics added); *see also* AR 5505-06 (¶¶ 4-5).[19]

───────────────

[19] In her Declaration, the *ex-officio* member discussed her role during the re-evaluation:

I was aware that another safety and health expert from the Safety and Mission
Assurance Directorate, [deleted], has been appointed to the SEB as an ex officio
member, and that he had performed a review of the S&H plans submitted for the
OMOH competition.  I did not have access to the OMOHC SEB's original findings,
notes, discussions, or other information at any time prior to or during my review of
the Wyle and CHS S&H plans.  I did not have any discussions with anyone about the
original findings before my review of the Wyle and CHS S&H plans.  Furthermore,
I did not have access to any of [deleted] opinions, notes, presentations, papers, etc.
relating to his work as the *ex officio* safety and health expert on the OMOH SEB
prior to my review.  I was directed by [deleted][, the SEB Chairman,] to review the
plans with no additional or outside input.  I was not told why a second review of the
S&H plans was necessary.

* * *

On September 13, 2005, I met with the OMOH SEB.  I was given the Safety and
Health Plans submitted by Comprehensive Health Services (CHS) and Wyle and
asked to review each plan to see how they compared to the solicitation requirements
for the contractor safety and health plans. . . . I read each plan and compared it to the
requirements of the contractor safety and health plans.  I then presented my opinions
to the OMOH SEB through oral discussions with them.  I did not formally document
my opinions.  The SEB did not discuss any aspect of their previous evaluation or
subsequent reevaluation of the S&H plans with me, nor was I privy to their scoring
of the S&H plans.  I did not assist the SEB in the actual writing of their findings
regarding the S&H plans of Wyle and CHS.  I provided my opinions verbally to the
SEB members present.  In my discussion with the SEB[,] I advised them that both of
the S&H plans were sufficient, but that Wyle's S&H plan was slightly more
technically acceptable because it adequately addressed every requirement in the DRD
[("Data Requirement Description")].  CHS's S&H plan was also sufficient, but CHS
did not address every technical requirement; however, they detailed a few additional
practices that would have been beneficial to CHS's S&H program.  Given that one
offeror met all of the DRD requirements (Wyle) and the other (CHS) did not meet all
of the DRD requirements, but added in some extra S&H practices led me to consider

After the re-evaluation, the SEB presented detailed findings to support re-scoring and re-rating the proposals, identifying the particular strengths of each and describing anticipated effects. *See* AR 4956-58, 5008-11, 5025-34l. The SEB presented these findings in the same detailed manner as the other evaluation factors and subfactors. *Compare id.*, *with* AR 4912-55, 4959-69, 4970-5007, 5012-20.

For these reasons, the court has determined that FAR 15.305(a)(3) was not violated.

### d.   The Source Evaluation Board's Re-Evaluation Of The Safety And Health Plan Subfactor Had A Rational Basis.

Claim One of the Amended Complaint alleges that NASA's award of the OMOH Contract to Wyle lacks a rational basis, because the SEB did not provide an explanation for re-rating and re-scoring the Safety and Health Plan Subfactors. *See* Amend. Compl. ¶ 42. The court previously determined that the reasons for the SEB's re-evaluation appropriately were documented in the Administrative Record, as supplemented, and that the SEB did not violate any procurement statute or regulation.

The SEB identified one "Significant Strength" and two "Strengths" with respect to Wyle's Safety and Health Plan. *See* AR 4956-58, 5026-27. The SEB classified Wyle's training plan as a "Significant Strength," because Wyle "identifie[d] training required for all contract positions and provide[d] a means to keep up with recurrent training requirements." AR 4956. The SEB explained that this "will ensure a safety conscious workforce . . . , thereby reducing the potential for mishaps and incidents at JSC." *Id.* The SEB further observed that Wyle "proposed an extensive safety and health training program with individual plans already determined by positions and job requirements[,]" as well as an electronic training database to track and schedule training. *Id.*

Prior to and after the re-evaluation, the SEB classified Wyle's Safety, Health, and Environmental Compliance Plan as a "Strength," because the Plan "demonstrate[s] a clear understanding of the requirements for successful operations at JSC." AR 4957. According to the SEB, the Plan "meets the requirements as provided in the applicable DRD in the RFP[,]" has a high Performance Evaluation Profile, and proposes a large number of specialists in various safety and health disciplines. *Id.* After the re-evaluation, the SEB continued to find this Factor a "Strength," but decided that the training portion of the Plan was a "Significant Strength" that could be "split out into its own[.]" *Id.* The SEB also classified Wyle's hazard analysis and identification a "Strength," because the proposal "shows a concern for personnel and for the overall safety culture at JSC." *See* AR 4958 ([deleted]).

---

the two plans essentially equal.

AR 5505-06 (¶¶ 4-5) (underlining in original) (italics added).

In contrast, the SEB classified CHS's plan to obtain VPP "Star" status within one year of the OMOH Contract start as a "Significant Strength," because "[t]his will further strengthen the overall JSC safety and health culture . . . [and] improve the likelihood of contract success." AR 5008. CHS also "present[ed] a complete, thorough, and well developed plan." *Id.* As a result, CHS's Safety and Health Plan had one "Significant Strength" and three "Strengths." *See* AR 5008-11.

During the re-evaluation, however, the SEB downgraded the prior rating from "Significant Strength" to a "Strength" for CHS's Safety, Health, and Environmental Compliance Plan. *See* AR 5009, 5031. The SEB conceded that CHS "exhibit[ed] a solid, comprehensive understanding of the requirements of the DRD, and of the overall JSC safety and health culture [and] . . . [t]here is a strong, continuous improvement emphasis throughout the plan." AR 5009. The SEB further identified the CHS management's "excellent commitment" to the overall safety and health culture as a strength and acknowledged CHS's program management's commitment to certain programs - - *e.g.,* "Empowerment Badge," "Safety, Health, and Environmental Steward Employee of the Year," and incident investigations. AR 5010. Additionally, the SEB recognized that CHS's commitment "ensures subcontractor safety and health performance is held at the same high level." *Id.* In addition, the SEB identified CHS's tracking and reporting capability for hazards and lessons learned as a "Strength," because this "will improve JSC's safety and health program." AR 5011. The SEB also explained that CHS proposed to transfer the existing databases to a Hazard Abatement and Tracking System, which "will ensure that all appropriate information is available to review and to perform analysis." *Id.* "By learning from previous incidents, the overall safety and health culture at the [C]enter can be improved." *Id.*

Claim One alleges that the SSA required the SEB re-rate and re-score their original findings. *See* Amend. Compl. ¶ 42 ("[N]either is it explained why 'the original findings' of the Source Evaluation Board 'were modified as required.'"). This allegation appears to be based on a solitary reference in the September 14, 2005 presentation to the SSA that: "The original findings were modified *as required*, and new findings were developed[.]" AR 5024 (emphasis added). CHS contends this language evidences that the SSA required the SEB specifically to modify prior findings.

CHS's interpretation, however, is not supported by any other part of the Administrative Record and is contradicted by several other portions of the record. *See, e.g,* AR 618 (Source Selection Statement: "I was therefore of the opinion that the Board either had not adequately evaluated the Safety Plans, or had not fully articulated an otherwise accurate evaluation. Accordingly, I requested the Board to take a fresh look at the Safety Plans (including obtaining the views of an independent safety expert who would be appointed an *ex officio* member of the SEB), and to report their results to me." (italics added)); AR 5498 (SSA Decl. ¶ 10: "[A]s a matter of prudence[,] I decided that the record would be more complete if I instructed the SEB, which could not articulate a credible reason for the wide variance in scores, to go back and satisfy themselves as to their evaluation of the S&H plans. I directed them to either confirm what they had already done and provide me with additional rationale to substantiate it, or to determined new findings and to rescore the proposals accordingly in this area."); AR 5512-13 (SEB Chairman Decl. ¶ 9: "[T]he SSA

directed us to re-look at both offerors' Safety and Health Plans.  He also requested that a new *ex officio* safety expert be identified, whom he would appoint to the Board.  I did not get any sense whatsoever from the SSA that he was looking for a particular answer or result from us, only that we were expected to be able to support our conclusions with adequate rationale, as we had with all of our other findings." (italics added)).   In the alternative, "as required" could be read as the SEB acknowledging that the SSA required a re-evaluation of the original findings or after discovering additional strengths during the re-evaluation that the applicable procurement regulations required the SEB to modify the original findings.   Accordingly, CHS has failed to establish by a preponderance of the evidence that the SSA *required* the SEB to re-rate and re-score their original findings.

Moreover, the NASA FAR Supplement authorizes the SSA "to rectify procedural omissions, irregularities or inconsistencies, substantiate its findings, or revise the presentation."  NASA FAR Supp. 1815.370(h)(3)(ii).   In this case, the SSA explained the actions to direct the SEB's re-evaluation in detail:

> [A]s a matter of prudence[,] I decided that the record would be more complete if I instructed the SEB, which could not articulate a credible reason for the wide variance in scores, to go back and satisfy themselves as to their evaluation of the S&H plans. I directed them to either confirm what they had already done and provide me with additional rationale to substantiate it, or to determined new findings and to rescore the proposals accordingly in this area.  An *ex officio* safety & health expert, [deleted], previously appointed to the SEB by me advised the [B]oard in their initial evaluation. In order to provide a fresh look at the plans, I directed that a second *ex officio* safety and health expert be appointed to assist the [B]oard.  I did not direct who from the Safety and Mission Assurance Office should be appointed to complete the task.

> \*   \*   \*

> In an effort to avoid bias, . . . I directed the second *ex officio* safety and health expert not be given access to any of the previous information or documents relating to the original safety and health expert's evaluation of the S&H plans or to the SEB's original deliberations.  I had no preconceived notions as to how the new safety and health expert would view the plans, what recommendation would be made, or how the SEB would evaluate them (*i.e.,* either qualitatively or quantitatively), I determined only that the documentation and associated explanations I had before me at the September 12, 2005[] meeting did not adequately correlate with the current scores.  I had no contact whatsoever with [deleted] at any time during this process, up to and until the September 14, 2005[] meeting [with the SEB], which she attended.

AR 5498-99 (¶¶ 10-11) (italics added).

This explanation is consistent with the Source Selection Statement and the Declarations of the SEB Chairman and the *ex-officio* member appointed to assist with the re-evaluation. *See, e.g.,* AR 618, 5498, 5512-13. Moreover, the SEB's September 14, 2005 presentation to the SSA was detailed and balanced. *Id.*; *see also* AR 4956-58, 5008-11, 5025-341. Accordingly, the court does not agree with CHS's characterization that the SEB's evaluation of the Safety and Health Plan Subfactor was arbitrary, capricious, or lacked a rational basis.

 e.    **The Source Selection Authority's Decision Had A Rational Basis.**

In addition, the Amended Complaint alleges that the SSA failed to assess and rate the two proposals equally. *See* Amend. Compl. ¶¶ 61-62 ("The 'Source Selection Statement' did not equally assess and rate the Comprehensive Health Competitive Proposal and the Wyle Competitive Proposal.");[20] *see also* Pl. Br. at 24-28. In addition, CHS argues that the SSA read Wyle's proposal "expansively[,] . . . resolving doubt in favor of [Wyle], while, at the same time, reading [CHS's proposal] with an exacting standard." Pl. Br. at 24.

---

[20] Claim Eight of the Amended Complaint alleges:

The "Source Selection Statement" did not equally assess and rate the Comprehensive Health Competitive Proposal and the Wyle Competitive Proposal. The "Source Selection Statement" maximized the only *Open Weakness* assessed by the expert Source Evaluation Board for the Comprehensive Health Competitive Proposal. Contrariwise, the "Source Selection Statement" minimized three *Open Weaknesses* assessed by the expert Source Evaluation Board for the Wyle Competitive Proposal. There was no consideration, in the "Source Selection Statement," of two *Open Weaknesses* assessed in the expert analyses of the Source Evaluation Board against the Past Performances of Kelsey[-]Seybold that are presented in the Wyle Competitive Proposal, but nonetheless the "Source Selection Statement" arbitrarily and capriciously discounted the *Significant Strength* observed by the expert Source Evaluation Board for Comprehensive Health's proposed Program Manager, this based on the employment of Wyle's proposed Program Manager with the incumbent Contractor, Kelsey[-]Seybold, and the "Source Selection Statement" arbitrarily and capriciously accredited Wyle's proposed "cadre of Key Personnel," all but one of whom are "incumbents who have multiple years of proven high quality experience and demonstrated performance," Administrative Record, at page 613, again, based on their employment by the incumbent Contractor, Kelsey[-]Seybold.

Amend. Compl. ¶ 61 (italics in original).

i.      **Comprehensive Health Services, Inc.'s Lead Physician's Failure To Have A Texas Medical License By August 24, 2005 Was A "Weakness."**

Claim Two of the Amended Complaint alleges that, on October 25, 2005, the date that the Source Selection Statement was issued, the SSA irrationally supported a "Weakness" assessment made against CHS, because of the Lead Physician's failure to obtain a Texas medial license. *See* Amend. Compl. ¶ 45.

A brief review of the relevant facts is required. On August 23, 2005, NASA notified both Wyle and CHS that the SEB would close discussions and final proposal revisions were due at 11:30 a.m. on August 24, 2005. *See* AR 4834, 4873. The Federal Acquisition Regulations specifically require that the agency "establish a common cut-off date" for receipt of final proposal revisions. 48 C.F.R. § 15.307(b) ("The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions."). NASA established these deadlines so that the SEB could conclude the evaluations and present findings to the SSA on September 12 and 14, 2005. *See* AR 4834, 4873.

On October 3, 2005, CHS's proposed Lead Physician received a temporary five-month Texas medical license and this information was forwarded to NASA. *See* AR 5399, AR 5401. This information, however, was supplied nearly six weeks after final date to submit revisions to an offeror's proposal.

The Government argues that "NASA could not have properly considered a change to CHS's proposal after the date of final proposal submissions, August 24, 2005."[21] Gov't Mot. for J. at 15 (citing *Dubinsky* v. *United States*, 44 Fed. Cl. 360, 363 (Fed. Cl. 1999) (holding that a contracting officer's discussions with offeror after receipt of final proposal revisions violated FAR 15.307(b) and the late offer clause, FAR 52.212-1(f))). Had NASA considered new information supplied after the cut-off date, as a revision to the offeror's proposal, the agency would have violated FAR 15.307(b) and such conduct reasonably could have been viewed as according CHS with preferential treatment. *See Integrated Bus. Solutions* v. *United States*, 58 Fed. Cl. 420, 428 (Fed. Cl. 2003) ("Here, as GAO recognized, it would have been unfair to require the other offerors to submit FRPs by the March 13 deadline but permit IBS to confirm its initial proposal days later.");

_____

[21] The Solicitation does permit NASA to consider "any proposal, modification, or revision received . . . after the exact time specified for receipt of offers" if three conditions are met:  1) the late submission is received before the award is made; 2) the Contracting Officer determined that accepting the late offer would not unduly delay the acquisition; and 3) the submission was received by the "initial point of entry to the Government infrastructure" not later than 5:00pm on the working day prior to the due date, the submission was received at the Government installation designated for receipt of offers prior to the due date, or only one proposal was received. *See* AR 300-01. This exception, however, does not apply in this case.

*Dubinsky* v. *United States*, 43 Fed. Cl. 243, 263-64 (Fed. Cl. 1999) ("[B]y providing a common cut-off date, it sets a level playing field on which [the offerors] may compete for the contract."); *see also In re G.D. Searle & Co.*, B-247077, B-247146, 92-1 CPD ¶ 406, 1992 WL 94903, at *2-*3 (Comp. Gen. Apr. 30, 1992) ("[A]gencies are required to provide all offerors the same information in order to ensure that the acquisition is conducted on an equal basis for all competing firms. . . .  In the absence of written notice to all offerors, it would have been unfair and improper to consider Searle's proposal, since the other offerors were not provided the same information and opportunity regarding the submission of their offers.").

Assuming *arguendo* that CHS's October 4, 2005 submission was timely, the SSA's assessment of this "Weakness" nonetheless had a rational basis.  In the Source Selection Statement, the SSA explained that this "Weakness" was considered "to be of greater weight than the Board concluded[, because] OMOH services are critical to the operation of the [Lyndon B. Johnson Space] Center and its mission[.]"  AR 612.  As the SSA explained:

> To have the role of lead physician filled by a temporary placeholder could adversely impact contract performance at the crucial time of contract phase-in and transition, when the effort is already vulnerable to disruption and a diminution in quality. Further, this [W]eakness cannot be corrected until and unless Texas issues the necessary medical licenses to the proposed individuals.  Although Wyle's proposal properly did not warrant a strength for meeting contract requirements in this area, I nevertheless found Wyle's licensed permanent personnel to be of greater value to the Government than the temporary personnel solution proposed by CHS in that Wyle's proposal, relatively speaking, will be less disruptive and more conducive to a smooth transition to the new OMOH [C]ontract.

*Id.*

Although CHS's proposed Lead Physician was granted a Texas medical license, on October 3, 2005, that license was *temporary* and only valid through April 1, 2006.  A temporary medical license did not address concerns that the SSA identified in the Source Selection Statement about the transition period.  *Id.*  Therefore, the court has determined that the SSA's concern about the uncertainty of the licensure of the Lead Physician was a rational basis for assessing CHS's proposal with a "Weakness."

44

ii.     **Wyle Laboratories, Inc.'s Failure To Provide A Plan For Adequate Staffing Of The Starport Fitness Center Was Not An "Important Concern.**"

Claim Three of the Amended Complaint alleges that the Source Selection Statement improperly discounted a "Weakness," *i.e.*, Wyle's failure to provide adequate staffing (full-time physical fitness personnel) for the Starport Fitness Center.  *See* Amend. Compl. ¶¶ 47-48.  CHS argues that the SSA should not have discounted rating, because Wyle made no enforceable promise to remedy this "Weakness."  *Id.*; *see also* Pl. Supp. Reply. at 8 ("This *Open Weakness* assessed against the Wyle Competitive Proposal by the Source Evaluation Board is unlawfully and unreasonably disregarded by the Source Selection Authority because it is considered in the 'Source Selection Statement' as resolved not based on any enforceable promises from Wyle, but instead only on the *supposition* that this failure to meet minimum Solicitation requirements could be rectified *after* Award.").  CHS, however, did not cite any statute or regulation that NASA has violated, nor provide any support for the contention that the SSA's decision lacked a rational basis.

The FAR requires that "the source selection decision . . . represent the SSA's independent judgment."  48 C.F.R. § 15.308.  Moreover, the FAR requires that:

> The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

*Id.*

Wyle proposed two full-time fitness personnel to staff the Starport Fitness Center.  *See* AR 5154.  The SEB determined that this was an insufficient number to cover the required operational hours at Starport Fitness Center.  *Id.*  The SEB, however, determined that Wyle's proposal included a sufficient number of personnel overall, "such that the cost proposal did not need to be adjusted to accommodate the one or two additional Fitness Center personnel."  AR 612.

As the SSA explained, in the Source Selection Statement:

> The last [W]eakness reported in the Wyle proposal under this subfactor was a failure to provide adequate staffing for the Starport Fitness Center.  This was the result of a change in Wyle's final proposal revision, which removed a number of part-time fitness trainers and staffed the Fitness Center with a limited number of full time physical fitness personnel, which was inconsistent with the hours of operation required.  Although I considered this [W]eakness to be of more substance than the two discussed immediately above, *I did not consider it to be of great impact to the Wyle proposal in that it would be easily correctable should Wyle be awarded the*

45

*OMOH contract.*  In fact, [the SEB] also noted that Wyle proposed sufficient personnel overall such that the cost proposal did not need to be adjusted to accommodate the one or two additional Fitness Center personnel.

*Id.* (emphasis added).

Therefore, the SSA's conclusions regarding staffing "Weakness" were well documented in Source Selection Statement and are supported by the SEB's findings.

CHS also argues that the SSA acted irrationally by emphasizing CHS's licensure "Weakness," but discounting Wyle's staffing "Weakness."  *See* Pl. Br. at 26-27 ("The Source Selection Authority harps on the lack of Texas licensure for Comprehensive Health's proposed Lead Physician (the fact of Dr. Mark Janczewski's Texas licensure was not considered because it was submitted after Final Proposal Revisions, NASA FAR Supplement 1815.307), yet he minimizes one of the three *Weaknesses* assessed by the Source Evaluation Board for the Wyle Competitive Proposal (the failure to provide full-time physical fitness personnel for the Starport Fitness Center), because he supposes that this failure to meet minimum manning requirements can be rectified *after* Award ('it would be easily correctible should Wyle be awarded the OMOH contract').").

The SSA, however, rationally concluded that the two "Weaknesses" presented different risks to the successful performance of the OMOH contract.  With respect to Starport Fitness Center staffing, the risk extended only to the potential minor inconvenience of temporary interruption of daily exercise.  In contrast, the Licensure "Weakness" was a potential source of disruption during the "crucial time of contract phase-in and transition."  AR 612.  By appreciating the unique characteristics of the two "Weaknesses," the SSA rationally determined that the licensure "Weakness" posed a greater risk to the success of the OMOH Contract.

For these reasons, the court has determined that the SSA's decision regarding the adequacy of staffing the Starport Fitness Center was not without rational basis.

### iii. Comprehensive Health Services, Inc. And Wyle Laboratories, Inc. Had "A Roughly Equivalent Volume Of Relevant Experience."

Claim Four of the Amended Complaint alleges that the SSA's conclusion that CHS and Wyle had "a roughly equivalent volume of relevant work experience" lacks a rational basis, because an offeror's past performance can only be measured by its own past performance, and not the past performance of its proposed subcontractors.  *See* Amend. Compl. ¶¶ 50-51 ("Wyle has no Past Performances on other Contracts requiring delivery of Occupational Medicine support services, and Kelsey[-]Seybold's Past Performance at Johnson Space Center are 'not roughly equivalent' to Comprehensive Healths's Past Performances at Kennedy Space Center[,] because, among other things, there are two *Open Weaknesses* assessed in the expert analysis by the Source Evaluation

46

Board against the Past Performances of Kelsey[-]Seybold that are presented in the Wyle Competitive Proposal." (italics in original)).

The Solicitation stated that "Past Performance indicates how well an offeror performed on relevant earlier work and can be a significant indicator of how well it can be expected to perform the work required under this procurement. . . . The evaluation will be based on information provided by offerors in their proposals, as well as any other information obtained independently by the SEB." AR 363.  The Solicitation requested that offerors and certain subcontractors to identify up to five contracts from the last three years "that *demonstrate the offeror's ability to perform the OMOHC work.*" AR 326 (emphasis added).  The Solicitation, however, did not specify that an offeror's prior experience is to be given more weight than the subcontractor's prior experience.  The Solicitation only advised offerors of the need to inform NASA of the ability to perform the work required by the OMOH Contract.  *See* AR 326, 363.  Therefore, the Solicitation required an offeror to detail the proposed usage of subcontractors and to identify the prior work experience of any major proposed subcontractors. *See* AR 314-24, 326, 331, 336-38.  Accordingly, the court reject's CHS's suggestion that the SSA improperly relied on the prior experience of Kelsey-Seybold, Wyle's proposed subcontractor.  *See Overstreet Elec. Co., Inc.* v. *United States*, 59 Fed. Cl. 99, 101 (Fed. Cl. 2003) (determining that the "solicitation did not mandate giving greater weight to past relevant jobs performed by the bidder solely as a prime contractor").

CHS also argues that the SSA's determination lacks a rational basis, because the SSA failed to consider two "Weaknesses" that the SEB assessed against Kelsey-Seybold's Past Performance at JSC:  "(a) Kelsey-Seybold's failure, under its current [OMOH] contract, 'to provide adequate physician staffing to all Human Test Support Activities,' . . . and (b) a '[c]ontentious relationship between the prime offeror (Wyle) and the current OMOH incumbent contractor (Kelsey-Seybold), who is a proposed subcontractor for this effort, regarding compliance with Hazardous Material Inventory Requirements.'" Pl. Supp. Reply Br. at 9 (alteration in original) (citing AR 5189, 5191).

The SEB's Final Report, however, clarified that the SEB was no longer concerned with either "Weakness." *See* AR 5189, 5191-92.  With respect to Kelsey-Seybold's physician staffing, the SEB concluded that this "Weakness" would not be repeated, because the offeror has [deleted].  AR 5189 (emphasis added).  With respect to the prior relationship between Wyle and Kelsey-Seybold, the SEB also dismissed this concern:

> Result of Final Evaluation - - In the FPR, the offeror addressed this concern with specific actions including methods to streamline the data transmission, and a commitment by management to ensure that the data will be transmitted in a timely manner.  Additionally the formation of a Wyle/Kelsey[-Seybold] team will resolve many of the cross contract issues and concerns.  Although this past performance [Weakness] remains, *the offeror has provided sufficient corrective action plans and plans for future interaction to assure the [B]oard that this relationship will not become contentious.*

AR 5191-92 (emphasis added).

The Administrative Record indicates that the SEB did not consider either of these to "be a significant indicator of how well it can be expected to perform the work required under this procurement." AR 363; *see also* AR 5189, 5191-92. Accordingly, the SSA did not act without a rational basis by not mentioning these two "Weaknesses" in analyzing the Past Performance Factor. As the Source Selection Statement evidences, the relevant past performance of both proposals was thoroughly evaluated:

> [U]nder the Past Performance Factor[,] the Board rated both companies as an Excellent. The companies' various strengths are also discussed above. In comparing the two offerors, including the detained data supporting the findings, it was apparent that Wyle has a noticeable advantage over CHS. Although both companies have a roughly equivalent volume of relevant experience and excellent references, it was noted that Wyle has a greater experience with large dollar value contracts, which are more comparable to the scale of the OMOH contract contemplated here. In addition, though not separately called out as a strength by the SEB, I noted that Kelsey-Seybold, Wyle's team member and proposed subcontractor for a multitude of OMOH activities is the current OMOH contractor and has held that directly relevant position with consistently excellent results, for many years at the JSC. Although both Wyle and CHS are competent contractors capable of performing the OMOH effort, based on the SEB's and my own assessment of their relative strengths, I concluded that Wyle's past performance offered a greater value to the Government.

AR 619.

Although the SSA did not consider the two "Weaknesses" relevant to future performance, in light of the discretion accorded to the SSA to evaluate competitive proposals and select the best value for the Government, the SSA's determination that Wyle and CHS have "a roughly equivalent volume of relevant experience" was not without a rational basis.

### iv. Wyle Laboratories, Inc. Had More "Large Dollar Value Contracts."

Claim Five of the Amended Complaint alleges that the SSA's conclusion that Wyle had more "large dollar value contracts" lacks a rational basis. *See* Amend. Compl. ¶¶ 53, 55; *see also* Pl. Br. at 31-32. CHS argues that it had more "large dollar value contracts" that required delivery of occupational medicine support services than Wyle. *See* Pl. Br. at 31-32. For example, CHS had a contract with the Transportation Security Administration ("TSA"), where CHS delivered over 167,000 pre-employment medical evaluation, drug screening, and physical performance evaluations from 157 geographically dispersed sites. *Id.* at 32; *see also* Amend. Compl. ¶ 55.

CHS is correct that the TSA occupational medicine support services was a significant contract. *See* AR 1948. Wyle, however, identified two contracts, valued at $298 million and $137 million that also involved occupational medicine, including:  the delivery of medical and

48

psychological support for astronauts; testing and evaluation of astronauts; clinical analysis; and medical monitoring. *See* AR 4510; *see also* AR 3798. The SSA also was influenced by the fact that Wyle proposed to use Kelsey-Seybold, the current incumbent, as a major subcontractor for the OMOH Contract. *See* AR 3555-56. Kelsey-Seybold's familiarity with JSC and previous work was considered highly relevant. *Id.*; *see also* AR 3809-17.

When the United States Court of Federal Claims considers a bid protest based on a past performance evaluation conducted in the context of a negotiated procurement, "the greatest deference possible is given to the agency." *Univ. Research Co., LLC* v. *United States*, 65 Fed. Cl. 500, 505 (Fed. Cl. 2005) (citing *Gulf Group Inc.* v. *United States*, 61 Fed. Cl. 338, 351 (Fed. Cl. 2004) (selected citations omitted)). In this case, Wyle had two contracts valued in excess of $435 million that required delivery of occupational medicine services. Therefore, the SSA's judgment that Kelsey-Seybold's incumbent status enhanced Wyle's Past Performance Factor was rational. *See CSE Constr. Co., Inc.* v. *United States*, 58 Fed. Cl. 230, 252 (Fed. Cl. 2003) (holding that an offeror may benefit from incumbent status in past performance evaluation without the announcement of such a subfactor); *Computer Scis.*, 51 Fed. Cl. at 311 (citations omitted).

Under these circumstances, the court declines to second-guess the SSA's determination that Wyle had "greater experience with large dollar value contracts, which are more comparable to the scale of the OMOH contract." AR 619. For these reasons, the court has determined that the SSA's conclusion regarding "large dollar value contracts" was not without rational basis.

### v.    Wyle Laboratories, Inc.'s Proposed Program Manager Provided "Greater Value" To The Government.

Claim Six of the Amended Complaint alleges that the SSA irrationally discounted the "Significant Strength" that the SEB accorded CHS's proposed Program Manager, by determining that Wyle's proposed Program Manager offered a greater value to the Government. *See* Amend. Compl. ¶ 57 (citing AR 612-13). CHS contends that this rating was made without consideration of the two "Weaknesses" assessed by the SEB regarding the Past Performances of Kelsey-Seybold: a staffing problem and a contentious prior relationship with Wyle. AR 5189, 5191. The Source Selection Statement, however, thoroughly explained the evaluation of the proposed program managers:

> Both companies proposed individuals who represented [S]ignificant [S]trengths. The individual proposed by Wyle was viewed as exceptionally well qualified, with over 20 years of directly related experience as a civil servant, with the current OMOH incumbent, and as program manager on the former JSC Life Sciences contract. All of this experience is directly applicable to the management of the OMOH contract and will enable overall operating efficiencies and effective communication at all levels of the contract effort. In addition, the proposed Wyle program manager has multiple professional associations and contracts which will be of great value to the OMOH contract in that a variety of medical specialists will be available that can be

applied to enhance the quality of medical services provided by Wyle.  Further, all references were very positive.  In comparison, the proposed CHS program manager is certified in occupational health, industrial hygiene, and safety, and has extensive experience in occupational and emergency medicine.  This combination of knowledge and demonstrated skills will ensure successful contract performance.  In examining the relative merits of both individuals' backgrounds, it was clear that both have the requisite credentials and experience to serve as able program managers on the OMOH contract.  However, I considered the proposed Wyle program manager to offer greater value to the Government.  His hands on, directly relevant management experience as a member of the JSC community, from both a Government and a contractor perspective will enable him to assume his role with a minimum learning curve.  Likewise, his knowledge of and familiarity with all aspects of the JSC OMOH program, together with his medical expertise, will enhance overall OMOH contract performance.

AR 612-13.

The SEB, however, did not place any significance on these two "Weaknesses."  Therefore, the court cannot conclude that the SSA erred by not mentioning either "Weakness" in the Source Selection Statement.  Instead, the Source Selection Statement contains a well reasoned and thorough explanation of the value that each proposed program manager provided to the Government.  *Id.*  For these reasons, the court has determined that the SSA did not act without a rational basis in declining to address these two "Weaknesses" in the Past Performance analysis.

### vi.  Wyle Laboratories, Inc.'s Personnel Was Considered A "Valuable Asset" By The Government.

Claim Seven of the Amended Complaint alleges that the SSA irrationally "accredited Wyle's proposed 'cadre of Key Personnel,' all but one of whom are 'incumbents who have multiple years of proven high quality experience and demonstrated performance,' . . . but did so also without consideration of the two *Open Weaknesses* assessed against the Past Performances of Kelsey Seybold presented in the Wyle Competitive Proposal."  Amend. Compl. ¶ 59 (quoting AR 613) (italics in original); *see also* Pl. Supp. Reply Br. at 10-11.  Here, CHS is referring to the following analysis of Wyle's Management Approach in the Source Selection Statement:

Along with its exceptional program manager, Wyle proposed a cadre of Key Personnel to manage implementation of all aspects of the OMOH contract who represented a strong and experienced team.  All but one of the key personnel proposed are incumbents who have multiple years of proven high quality experience and demonstrated performance.  This familiarity with the OMOH program will result in operating efficiencies, effective communications, and teamwork, thus facilitating excellent performance of the contract.  In addition, Wyle proposed highly experienced personnel, along with commitment letters for each of them, for all

critical positions required by the contract. This demonstrated Wyle's assurance that these critical positions will be staffed with qualified personnel. I, therefore, concluded that this [S]ignificant [S]trength is of great value to the Government because it ensures that the contract will be performed by highly capable and knowledgeable personnel. CHS has no comparable strength in this area.

AR 613.

As previously discussed, the SEB identified two "Weaknesses" regarding the Past Performance of Kelsey-Seybold: a staffing problem and a contentious prior relationship with Wyle. *See* AR 5189, 5191. Because the SEB did not place any significance on these "Weaknesses," there is no basis for the court to conclude that the SSA erred by not discussing them in the Source Selection Statement. Again, the Source Selection Statement contains a thorough analysis of Wyle's proposal, including the fact that a number of individuals that had prior direct involvement with the OMOH Program. In addition, the Administrative Record evidences that the SSA determined that this "Significant Strength" offered a greater value to the Government than CHS's offer. *See* AR 613. Accordingly, the court has determined that the SSA did not act without rational basis by not mentioning these two "Weaknesses" in the Past Performance Factor analysis.

> ### vii.  Wyle Laboratories, Inc.'s And Comprehensive Health Services, Inc.'s Cost Estimates Were "So Close As To Not Be Worthy Of Further Consideration."

Claim Nine of the Amended Complaint alleges that the SSA's conclusion that "probable costs were so close as to not be worthy of further consideration" was irrational, because Wyle's estimated cost was $[deleted], whereas CHS's estimated cost was [deleted]. *See* Amend. Compl. ¶¶ 64-65. CHS is correct that Wyle's estimated cost is approximately $3.3 million more than CHS's, however, the SSA's decision was rational, because the Solicitation clearly stated that the combined Mission Suitability and Past Performance Factors are "*significantly* more important" than Cost. AR 364 (emphasis added).

Prior to placing CHS and Wyle in the competitive range, the SEB evaluated the estimated cost of performance of each offeror's estimated costs, with adjustments for any unique approach to contract performance. *See* AR 4452. In addition, the SEB considered whether each offeror's estimated cost was realistic for the work to be performed and made Mission Suitability score

adjustments to correct for any unrealistic costs - - such adjustments are set forth in the NASA FAR Supplement.[22]  *See* NASA FAR Supp. 1815.305(a)(3)(B).  The SEB's initial evaluation was:

|  | Cost Adjustment | Proposed Cost | Probable Cost |
|---|---|---|---|
| Wyle | [deleted] | $[deleted] | $[deleted] |
| CHS | [deleted] | $[deleted] | $[deleted] |
| [deleted] | [deleted] | $[deleted] | $[deleted] |

AR 4452.  The SEB determined that, because of the percentage difference between proposed and probable costs, Wyle's Mission Suitability score should be adjusted downwards [deleted] points and CHS's should be adjusted downwards [deleted] points.  *Id.*

Next, the SEB determined that [deleted] was not within the competitive range and held additional discussions with Wyle and CHS, permitting each to submit Final Proposal Revisions.  *See* AR 5116; *see also* NASA FAR Supp. 1815.306(d)(3)(A) ("The contracting officer shall identify any cost/price elements that do not appear to be justified and encourage offerors to submit their most favorable and realistic cost/price proposals, but shall not discuss, disclose, or compare cost/price elements of any other offeror.").   Following these discussions and receipt of Final Proposal Revisions, the SEB again re-evaluated the proposals and determined that the two offerors "addressed [the] issues identified during the evaluation of the initial cost proposals."  *Id.* ("All issues from the initial cost proposals were satisfactorily resolved[.]").   Thereafter, the SEB revised the cost estimates, without requiring any adjustments to the Mission Suitability score, because the differences between the proposed and probable costs did not exceed 5%:

---

[22] The NASA FAR Supplement sets forth the requisite point adjustment for the Mission Suitability Factor, based on the percentage difference between proposed and probable costs, as:

| Percentage Difference | Point Adjustment |
|---|---|
| +/- 0 to 5 percent | 0 |
| +/- 6 to 10 percent | -50 |
| +/- 11 to 15 percent | -100 |
| +/- 16 to 20 percent | -150 |
| +/- 21 to 30 percent | -200 |
| +/- 30+ percent | -300 |

*See* NASA FAR Supp. 1815.305(a)(3)(B) 1815.305(a)(3)(B).

52

|  | Cost Adjustment | Proposed Cost | Probable Cost |
|---|---|---|---|
| Wyle | [deleted] | $[deleted] | $[deleted] |
| CHS | [deleted] | $[deleted] | $[deleted] |

AR 5117-18; *see also* AR 607.  Consequently, the SEB estimated that CHS's probable cost would be approximately $200,000 more than Wyle's probable cost over the ten year contract.  *Compare* AR 5117, *with* AR 5118.

The Source Selection Statement discussed the SEB's evaluation of the Final Proposal Revisions and analysis of the Board's results:

> The Board performed the cost analysis contemplated by the [Solicitation], made the necessary adjustments to the costs proposed, and arrived at a probable cost for each offeror.  These adjustments did not result in a Mission Suitability offset for either of the proposals.  I discussed in detail the method of cost analysis with the Board, specifically inquiring as to how probable cost adjustments were performed for each offeror, to assure myself that the adjustments were both sound and consistent with the offerors' respective approaches.  Although the probable cost of CHS [sic] was slightly lower than that of Wyle [sic] by a very narrow margin, the costs were so close, particularly viewed over the life of the contract, as to be essentially equal.

> *   *   *

> Finally, under the Cost Factor, as noted previously[,] the probable costs were overall so close as to not be worthy of further consideration as a discriminator between the two proposals.

AR 607, 619.

After reviewing the SEB's cost evaluation, in the court's judgment, the SSA rationally exercised his discretion in concluding that cost was not a discriminator between Wyle's and CHS's proposals, particularly in light of the emphasis the Solicitation placed on the other evaluation factors.  Moreover, as a matter of law, NASA is accorded considerable deference in undertaking a negotiated, best-value procurement.  *See, e.g., Galen Med. Assocs.*, 369 F.3d at 1330 (holding that, because the contract was to be awarded based on best value, "the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); *TRW*, 98 F.3d at 1327 (same).  The SSA, therefore, has the discretion to award the contract to the higher cost bidder where the added benefits of a higher priced proposal are worth the added costs.  *Id.*

Accordingly, the court has determined that the SSA's decision that "probable costs were overall so close as to not be worthy of further consideration" was not without rational basis.

      **viii.**    **Comprehensive Health Services, Inc.'s And Wyle Laboratories, Inc.'s Proposal Were Evaluated In The Same Manner.**

      CHS also argued that the SSA evaluated the two proposals in an unequal manner. *See* Pl. Br. at 24-28; *see also* Amend. Compl. ¶¶ 61-62. Although the SSA identified several areas where the CHS proposal presented a better value to the Government, the SSA's overall evaluation had a rational basis in light of the requirements of the Solicitation, the findings of the SEB, and the analysis evidenced in the Source Selection Statement.

      **f.**    **The Source Selection Authority Did Not Breach An Implied Duty Of Good Faith, Fair Dealing, And Honest Consideration.**

      Claim Eleven of the Amended Complaint alleges that NASA breached "the implied-in-fact Contract of good faith, fair dealing, and honest consideration that [the] National Aeronautics and Space Administration's Lyndon B. Johnson Space Center entered into with Comprehensive Health when the Competition under Request for Proposal Number NNJ05064093R commenced." Amend. Compl. ¶ 70.

      The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to a contracting partner. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 ("Every contract imposes upon each a duty of good faith and fair dealing in its performance and its enforcement."); *see also Rumsfeld* v. *Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003) ("Government coercion may be supported by a finding that the government engaged in wrongful acts by violating the contract without a good-faith belief that its actions were justified or by violating the covenant of good faith and fair dealing implicit in every contract."); *Essex Electro Eng'rs, Inc.* v. *Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (citation omitted).

      The covenant "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to . . . destroy the reasonable expectations of the other party regarding the fruits of the contract." *First Nationwide Bank* v. *United States*, 431 F.3d 1342, 1349 (Fed. Cir. 2005) (citing *Centex Corp.* v. *United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)). This duty applies to the Government throughout the procurement process. *See Emery Worldwide Airlines*, 264 F.3d at 1078-80; *Impresa*, 238 F.3d at 1331-32; *Southfork Sys.*, 141 F.3d at 1132.

      If the Government conducts a procurement in an arbitrary, capricious or irrational manner, then it has breached the implied contract to consider all bids fairly and honestly. *See Southfork Sys.*, 141 F.3d at 1132 ("The government is said to breach the implied contract 'if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant.'" (quoting *Central Arkansas Maint., Inc.* v. *United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995))). In other words, the

Government must comply with the applicable sections of the FAR when conducting a procurement and may be held liable for damages if it acts contrary to any statute or regulation.  *Id.* at 1135.

The predecessor court to the United States Court of Appeals for the Federal Circuit identified four relevant factors to help a trial court determine if a breach of the duty of good faith and fair dealing has occurred:  1) absence of a reasonable basis for the administrative decision; 2) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; 3) proven violations of pertinent statutes or regulations; and 4) subjective bad faith.  *See Keco Indus., Inc.* v. *United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974); *accord Southfork Sys.*, 141 F.3d at 1133; *Prineville Sawmill Co., Inc.* v. *United States*, 859 F.2d 905, 911-12 (Fed. Cir. 1988).  The United States Court of Appeals for the Federal Circuit subsequently has clarified that there is no requirement that each of the four factors be present in order for the court to find a breach.  *See Prineville Sawmill*, 859 F.2d at 911.

Since the court has determined that NASA did not violate any statute, regulation, or provision of the United States Constitution.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Therefore, the first three *Keco* factors do not support a breach in this case.  As to the fourth factor, CHS bears a heavy burden to establish that NASA acted in bad faith.  *See Caldwell & Santmyer, Inc.* v. *Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it.").  The presumption of good faith "is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.'"  *Schism* v. *United States*, 316 F.3d 1259, 1302 (Fed. Cir.2002) (quoting *Alaska Airlines, Inc.* v. *Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993) (citations omitted)).  Plaintiff's burden is "intended to be very difficult," requiring clear and convincing proof that the Government specifically intended to injure Plaintiff.  *See Am-Pro Protective Agency*, 281 F.3d at 1240.  During the procurement, NASA engaged in numerous discussions both Wyle and CHS and permitted both offerors to revise their original proposals to address any perceived weakness or limitation.  *See* AR 4404-08, 4410-14, 4425-27, 4429-31, 4769-71, 4803-05; *see also* AR 1893-2160, 3169-4379.  The SEB also evaluated both proposals, documented findings, and presented them to the SSA.  *See* AR 605; *see also* AR 5047-240.  Although the SSA directed the SEB to re-evaluate the Safety and Health Subfactor, the Administrative Record demonstrates that the SSA acted within its discretion and that the SEB's re-evaluation was likewise rational and sufficiently documented. Therefore, the Administrative Record does not support a finding of subjective bad faith.

Moreover, CHS has failed to overcome the presumption of regularity given to Government officials in the course of their duties.  *See Info. Tech. & Applications*, 316 F.3d at 1323 n.2 ("An agency decision is entitled to a presumption of regularity." (quoting *Impresa*, 238 F.3d at 1338)); *Galen Med. Assocs.*, 369 F.3d at 1330 ("[W]hen a bidder alleges bad faith, in order to overcome the presumption of good faith on behalf of the government, the proof must be almost irrefragable." (internal quotations and alterations omitted)); *see also A-Transport Nw. Co., Inc.* v. *United States*, 36 F.3d 1576, 1585 (Fed. Cir. 1994) ("Since the Government is entitled to a presumption that it acted in good faith, . . . a contestant bears the burden of proof on the issue.") (internal citations omitted).

Accordingly, as a matter of law, CHS's claim that NASA breached the implied duty of good faith, fair dealing, and honest consideration must be dismissed.

## IV.  CONCLUSION

For the reasons discussed herein, the Government's December 22, 2005 Motion to Supplement the Administrative Record is granted.  CHS's November 22, 2005 Motion for Judgment on the Administrative Record is denied.  The Government's November 30, 2005 Cross-Motion for Judgment on the Administrative Record is granted.

The Clerk of the United States Court of Federal Claims is directed to dismiss this action.

**IT IS SO ORDERED.**

<u>s/**Susan G. Braden**</u>
**SUSAN G. BRADEN**
**Judge**

56